**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

———————————————————— )
In re EXPRESS SCRIPTS, INC., )
PHARMACY BENEFITS MANAGEMENT )     MDL No. 1672
LITIGATION )
———————————————————— )

## MEMORANDUM

Express Scripts, Inc. ("ESI"), and its subsidiary National Prescription Administrators, Inc. ("NPA"), are Defendants in several interrelated cases before this Court. In the matter currently at bar, Plaintiff Patrick J. Lynch, trustee of the Active and Retiree Health and Welfare Funds of the Patrolmen's Benevolent Association of the City of New York ("the PBA Plan" or "the Plan"), filed suit against ESI and NPA on the Plan's behalf. In the Complaint, Plaintiffs claim that the Defendants breached their fiduciary duty and violated several state consumer fraud statutes while providing pharmacy benefit management services to the PBA Plan. Plaintiffs seek restitution of the PBA Plan assets that Defendants allegedly converted for their own use and benefit, disgorgement of the profits Defendants earned through allegedly wrongful conduct, and reimbursement for the increased costs caused by Defendants' alleged conduct. In May of 2005, this case was consolidated with several other lawsuits filed against ESI and NPA, and transferred to this Court for coordinated pretrial proceedings. This is before the Court on ESI's Motion for Summary Judgment (#6).

## SUMMARY JUDGMENT STANDARD

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. *New England Mut. Life Ins. Co. v. Null*, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *City of Mt. Pleasant v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Fed. R. Civ. P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962). The burden is on the moving party. *City of Mt. Pleasant*, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow the Court to return a verdict for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In passing on a motion for summary judgment, the Court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983). The

Court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976). With these principles in mind, the Court turns to an examination of the facts.

## BACKGROUND

The PBA Plan is a trust fund that provides health benefits for active and retired New York City Police Officers. In 1981, the Plan contracted with NPA to administer its prescription drug program. As part of this arrangement, NPA worked with prescription drug plan sponsors, insurance companies, and third party administrators to facilitate the supply of prescription drugs to plan participants. The relationship between these entities continued until 2002, when the Plan replaced NPA with a new prescription benefit manager. Some time later, Plaintiffs came to believe that Defendants had entered into "secret self-dealings" with drug manufacturers to obtain additional profits. Pl's Complaint at ¶ 24. Plaintiffs allege that Defendants purposely failed to disclose these methods of compensation, and that the resulting profits rightfully belonged to the Plan. Plaintiffs brought this lawsuit to redress the injuries suffered from Defendants' alleged wrongdoing. However, the PBA Plan's change in prescription benefit manager coincided with ESI's acquisition of NPA, complicating affairs greatly. The remainder of this factual recitation focuses upon this narrow aspect of the case.

In July of 2001, the PBA Plan began to reevaluate its choice of prescription benefit manager, and sought offers from NPA's competitors. Several entities competed for the Plan's business, including NPA and ESI. While the bidding process was ongoing, ESI entered into negotiations for

the acquisition of NPA. On February 5, 2002, ESI and NPA signed a Stock and Asset Purchase Agreement. The deal closed on April 12, 2002, and NPA became ESI's wholly owned subsidiary.

After signing the Purchase Agreement, NPA ceased vying for the PBA Plan's business. However, ESI continued to aggressively court the Plan. ESI focused on the benefits of continuity, noting that "NPA's entire pharmacy benefits management business [was] included in the purchase agreement, and [that ESI was] fully committed to retaining and honoring all existing sponsor contracts," ensuring a "seamless transition" for NPA customers. Pl's Stmt of Additional Facts, at ¶ 14. Nonetheless, on April 15, 2002, the PBA Plan informed NPA that their relationship would terminate in July of 2002. ESI made subsequent attempts to recover the PBA Plan's business, but its efforts proved unsuccessful.

From April 12 until July 31, the NPA-ESI operation continued to honor the PBA Plan's contract with NPA. During that period, ESI made significant changes to NPA's corporate structure. ESI replaced most of the company's upper management with its own staff, transferred NPA's management activities and records to its own headquarters, and, in the summer of 2002, began to cut NPA's workforce. However, much remained the same. The Plan continued to use NPA's drug formulary and claims adjudication platform, customers' mail order prescriptions were filled by NPA's mail order pharmacy, and the Plan continued to deal with the same NPA account management team. NPA invoiced the PBA Plan for services rendered, and the Plan submitted its payments to NPA. In addition, NPA maintained separate bank accounts, accounts payable and receivable departments, and

computer systems.[1] To this day, NPA continues to be an active business in good standing in the State of New Jersey, maintains separate financial records, and has its own offices and employees in New Jersey.

On August 1, 2005, a new company replaced NPA-ESI as the PBA Plan's prescription benefit manager. The combined NPA-ESI operation wound up old business with the Plan – sending bills, obtaining rebates for previously filled prescriptions, and remitting said rebates to the Plan – and then ceased relations completely. In essence, the Plan did business with NPA-ESI for a sum total of three and a half months.

In February of 2003, Plaintiffs filed a federal diversity action against NPA, ESI, and certain drug manufacturers in the Southern District of New York. The action was consolidated with other related suits by the Judicial Panel for Multidistrict Litigation, and transferred to this Court for pretrial proceedings. ESI filed this motion for summary judgment, arguing that Plaintiffs' claims of breach of fiduciary duty must be dismissed as to ESI and that Plaintiffs failed to state a claim for consumer fraud. Responsive pleadings have been filed, and this motion is ripe for review.

## DISCUSSION

## I.  Breach of Fiduciary Duty

---

[1]NPA's accounts payable department merged with ESI's in July of 2002, therefore, for a short period of time, NPA had no separate accounts payable department while the PBA Plan was working with the joint NPA-ESI operation.

Count I of Plaintiffs' Complaint claims that NPA and ESI were fiduciaries of the PBA Plan and breached their common law fiduciary duty by using undisclosed "pricing spreads," improperly retaining manufacturer rebates, conspiring with drug manufacturers to inflate the price of prescription drugs, and distributing PBA Plan participant information for personal profit. In its Motion for Summary Judgment, ESI argues that Plaintiffs' claim for breach of fiduciary duty must be dismissed as to ESI. As the basis for its assertion, ESI posits two correlated arguments: ESI was not itself a fiduciary of the PBA Plan, and ESI cannot be held liable for the obligations of its wholly owned subsidiary.

A.      Choice of Law

This Court is adjudicating a diversity action that was filed in New York district court, and subsequently transferred to the Eastern District of Missouri for consolidated pretrial proceedings. Generally, a court applies the forum state's choice of law principles when faced with state law claims. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941); *Stricker v. Union Planters Bank, N.A.*, 436 F.3d 875, 877 (8th Cir. 2006). However, when a transferee court presides over a consolidated diversity action, it must apply the choice of law rules of the jurisdiction in which each case was originally filed. *Van Dusen v. Barrack*, 376 U.S. 612, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964); 28 U.S.C. § 1407. Therefore New York choice of law rules apply.

In New York, courts apply an interest analysis that gives "controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the

greatest concern with the specific issue raised in the litigation." *Hughes v. LaSalle, Bank, N.A.*, 419 F. Supp. 2d 605, 617 (S.D.N.Y. 2006) (quoting *Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277 (N.Y. 1993)). The relevant contacts are the parties' domiciles and the situs of the tort's commission. But if "the parties are domiciled in different states, ... the situs of the tort controls in cases involving ... claims for breach of fiduciary duty." *Id.* (citing *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996)).

In this case, the PBA Plan is a domiciliary of New York, NPA is a domiciliary of New Jersey, and ESI has its principle place of business in Missouri and is incorporated in Delaware. The relationship giving rise to this action developed in New York. In addition, Defendants billed the Plan in New York, and collected rebates that were accrued in New York. Therefore, the situs of the alleged tort was in New York. Accordingly, New York law controls the fiduciary duty analysis.

B.      ESI's Fiduciary Status

To set forth a prima facie claim for breach of fiduciary duty, a plaintiff must first establish that the parties were in a fiduciary relationship. *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir. 1986). Stated broadly, a fiduciary relationship exists where "a party repose[s] confidence in another and reasonably relie[s] on the other's superior expertise or knowledge." *Anonymous v. CVS Corp.*, 728 N.Y.S.2d 333, 337 (N.Y. Sup. Ct. 2001); *see also Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991) (fiduciary relationship exists "when one ... is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation"), *accord* Restatement (Second) of Torts § 874. A conventional business relationship, absent additional factors, does not give rise to a fiduciary relationship. *Ruben H. Donnelley Corp. v. Mark I Mktg. Corp.*, 893

F. Supp. 285, 289 (S.D.N.Y. 1995); *RKB Enters. Inc. v. Ernst & Young*, 582 N.Y.S.2d 814, 816 (N.Y. App. Div. 1992). To distinguish between a fiduciary relationship and a typical business relationship, courts look to factors such as the parties' intent, the length of their relationship, their financial interdependence, and their sharing of confidential and proprietary information. *In re Kressner*, 206 B.R. 303, 312 (Bankr. S.D.N.Y. 1997); *ADT Operations, Inc. v. Chase Manhattan Bank, N.A.*, 662 N.Y.S.2d 190, 192 (N.Y. Sup. Ct. 1997).

Therefore, the PBA Plan must show that it put confidence in and relied upon ESI, and that its reliance was reasonable. *Anonymous*, 728 N.Y.S.2d at 337. The nature of the parties' relationship must have been such that it "imposed a duty upon [ESI] to act in the [Plan]'s interest, even if such action were to [ESI's] detriment ...." *Maalouf v. Salomon Smith Barney, Inc.*, No. 02 Civ 4770, 2003 WL 1858153, at *5 (S.D.N.Y. Apr. 10, 2003).(quoting *In re Sallee*, 286 F.3d 878, 892 (6th Cir. 2002)). Finally, the Plan must establish that the fiduciary relationship was in existence at the time of the complained of actions. *Martian Entm't, LLC v. Harris*, --- N.Y.S.2d ---, 2006 WL 2167178, at * 6 (N.Y. Sup. Ct. Jul. 5, 2006) (Table); *Elghanian v. Harvey*, 671 N.Y.S.2d 266, 266 (N.Y. App. Div. 1998).

After analyzing the facts, the Court determines that ESI was not a fiduciary of the Plan. NPA engaged in a majority of the allegedly fraudulent behavior prior to ESI's acquisition. Therefore ESI had no relationship with the PBA Plan when much of the allegedly fraudulent activity occurred. As to any fraudulent behavior that occurred after the acquisition, it cannot be said that a fiduciary relationship developed in such a short period of time. During the three and a half months that the Plan was associated with ESI, all parties were aware that their business relationship would soon

terminate.  Under those circumstances, it would be unreasonable for a sophisticated entity to repose

a high level of trust and confidence in a corporation.  ESI could not have acquired influence over the

PBA Plan in a three and a half month relationship, nor could the Plan have reasonably reposed any

confidence in ESI during a three and a half month relationship.  *See DFP Mfg. Corp. v. Northrop*

*Grumman Corp.*, No. 97-4494, 1999 WL 33458384, at *9 (E.D.N.Y. 1999) ("Generally, commercial

transactions do not create fiduciary obligations, absent express language in the contract, or a

prolonged prior course of dealings between the parties establishing the fiduciary relationship").  When

ESI acquired NPA, less than four months remained on NPA's contract with the Plan.  The fact that

the PBA Plan trusted ESI to complete performance of NPA's contract is legally insufficient to create

a fiduciary relationship.[2]  The Court finds that a fiduciary relationship could not have developed in

such a tenuous and short lived business arrangement.


C.    Parent Company's Liability for Obligations of Subsidiary


The Court must now determine whether ESI can be held responsible for the obligations of

NPA, its wholly owned subsidiary.  Plaintiffs argue that ESI is liable under theories of corporate veil

piercing and agency.[3]  The Court will address each of these arguments in turn.

---

[2]*See Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.*, 944 F. Supp. 1169
(S.D.N.Y. 1996) (in arm's length commercial transactions, fiduciary relationships develop only in
extraordinary circumstances); *Fleet Bank v. Pine Knoll Corp.*, 736 N.Y.S.2d 737, 741 (N.Y.
Supr. Ct. App. Div. 2002) (developing a fiduciary relationship "requires a closer degree of trust
than an ordinary business relationship").

[3]Plaintiffs also argue that NPA was dissolved when ESI filed an I.R.C. § 338(h)(10) tax
election, rendering ESI fully liable for NPA's debts.  However, Plaintiffs' reliance is misplaced.
According to Section 338:

if a purchasing corporation makes an election under this section ..., then, in the
case of any qualified stock purchase, the target corporation--

1.      *Piercing the Corporate Veil*


As a general rule, a parent corporation is not liable for the debts of its subsidiary.  "New York courts are 'reluctant' to disregard corporate form," *Manchester Equip. Co. v. Am. Way & Moving Co.*, 60 F. Supp. 2d 3, 6 (E.D.N.Y. 1999) (quoting *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979)), but they will pierce the corporate veil "to prevent fraud or other wrong, or where a parent dominates and controls a subsidiary."  *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 778 (2d Cir. 1995) (internal quotations omitted).  Therefore, a court should disregard corporate formalities between a parent and its subsidiary "only when the form has been used to achieve fraud," or when the subsidiary has been so dominated by a parent corporation, "and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own[,] and can be called the other's alter ego."  *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979).


Under a fraud theory, corporate formalities are disregarded where: "(1) the [parent corporation] exercised complete domination of the [subsidiary] corporation in respect to the transaction attacked; and (2) ... such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury."  *Morris v. N.Y. State Dep't of Taxation & Fin.*, 623

---

(1) shall be treated as having sold all of its assets at the close of the acquisition date at fair market value in a single transaction, and

(2) shall be treated as a new corporation which purchased all of the assets referred to in paragraph (1) as of the beginning of the day after the acquisition date.

I.R.C. § 338(a).  However, this election only affects the status of the corporations for tax purposes.  *See Avatar Bus. Connection, Inc. v. Uni-Marts, Inc.*, No. 04-1866, 2005 WL 3588482, at *13 (D.N.J. Dec. 29, 2005); *Alper v. Altheimer & Gray*, No. 97-1200, 2002 WL 31133287, at *7 (N.D. Ill. Sept. 26, 2002); *Bankers Life & Cas. Co. v. United States*, No. 93-4739, 1996 WL 137646 (N.D. Ill. Mar. 25, 1996).  Therefore, ESI's Section 338 election is irrelevant to this action.

N.E.2d 1157, 1160-61 (N.Y. 1993); *accord MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001). And under the alter ego doctrine, the veil will be pierced "to achieve equity, even absent fraud, where the officers and employees of a parent corporation exercise control over the daily operations of a subsidiary corporation and act as the true prime movers behind the subsidiary's actions," or "where a parent corporation conducts business through a subsidiary which exists solely to serve the parent." *Townley v. Emerson Elec. Co.*, 681 N.Y.S.2d 741, 744-45 (N.Y. Sup. Ct. 1998).

Determining whether to disregard corporate formalities is a fact specific inquiry. Courts are to consider many factors, including:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity; and (10) intermingling of property between the entities.

*MAG Portfolio Consultant*, 268 F.3d at 63 (quoting *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997)). The relationship between parent and subsidiary is to be examined "at the time" of the transaction attacked. *Lowendahl v. Baltimore & O.R. Co.*, 287 N.Y.S. 62, 75 (N.Y. App. Div. 1936); *accord Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991), *Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 853 (2d Cir. 1985), and *Shelley v. Flow Int'l Corp.*, 724 N.Y.S.2d 244, 246 (N.Y. App. Div. 2001) (all citing *Lowwendahl* for this premise). Ultimately "control is the key." *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988).

Pursuant to *Lowendahl*, the time period relevant to this inquiry is from April 12, when ESI acquired NPA, to July 31, when the PBA Plan ceased doing business with the joint NPA-ESI operation. ESI purchased NPA with the intention of incorporating NPA into its own business structure. And during the relevant three and a half month period, ESI acted in accordance with that intention. ESI's officers and directors managed NPA at the executive level, and NPA ceased competing against ESI for the PBA Plan's business. ESI also transferred NPA's management activities and records to its own headquarters and reduced NPA's workforce. However, NPA continued to maintain its own bank accounts, accounts receivable department, and computer systems. NPA remained an active business in good standing in the State of New Jersey, maintained separate financial records, and had its own offices and employees in New Jersey. The parties continued operating under NPA's contract, and the Plan continued using NPA's drug formulary and claims adjudication platform. In addition, customer's mail order prescriptions were filled by NPA's mail order pharmacy, the PBA Plan worked with an NPA account management team, NPA invoiced the PBA Plan for services rendered, and the Plan submitted its payments to NPA.

As stated above, in an alter ego analysis, "control is key." *Am. Protein Corp.*, 844 F.2d at 60. And ESI has not shown, as a matter of law, that it did not act as the "prime mover[] behind [NPA]'s actions." *Townley*, 681 N.Y.S.2d at 744. The Court finds it possible that NPA served as an ad interim entity, continuing to service its clients until ESI could fully incorporate NPA's business into its own. If NPA existed to temporarily serve clients for ESI, then it existed solely to serve its parent corporation, and was indeed an alter ego of ESI. *Id.* at 745. Although ESI cannot be held liable for any actions taken by NPA prior to the acquisition, the same cannot be said for actions taken subsequent to the acquisition. On this matter, ESI has not established its right to judgment with

sufficient clarity. Plaintiffs' claim against ESI for breach of fiduciary remains viable for any conduct occurring after April 12, 2002.

2.      *Agency*

Plaintiffs next argue that ESI manifested an intent to be bound by the NPA - PBA Plan contract, rendering ESI liable for all fraudulent actions taken by NPA. For the reasons stated below, proceeding under an agency theory leads to the same conclusion reached in the Court's alter ego analysis.

Plaintiffs base their agency argument on a quote from *Oy Noresein AB v. ICC Indus., Inc.*, which states that "a parent corporation may become a party to its subsidiary's contract under an agency theory if the parent's conduct manifests an intent to be bound by the contract." No. 91-1748, 1991 WL 161367, at * 1 (S.D.N.Y. 1991), *cited by*, *Royal Indus. Ltd. v. Kraft Foods, Inc.*, 926 F. Supp. 407, 413 (S.D.N.Y. 1996). "Such an intent can be inferred from the parent's participation in the negotiation, termination and attempted renegotiation of the contract." *Id.* (citing *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 652 F.2d 340 (3d Cir.1981)). In *Oy Noresein,* a subsidiary negotiated a contract on behalf of its parent corporation. The parent subsequently breached the contract, and the injured party brought suit against the subsidiary for the breach. The court absolved the subsidiary of liability "[b]ecause an agent is not liable on contracts it negotiated on behalf of a disclosed principal." *Id.*

The dispute in *Oy Noresein* bears no resemblance to the one at bar. In this case, ESI acquired NPA long after NPA negotiated its contract with the PBA Plan, and the Plan is not claiming breach of contract. Agency theories cannot hold ESI liable for actions taken by NPA while it was ESI's competitor. At that time, NPA had no authority to act on ESI's behalf. However, as in the alter ego analysis, if NPA continued engaging in fraudulent actions after the acquisition, agency theories could impose liability on ESI for those later harms.

An agency relationship exists if "the subsidiary ha[d] authority, actual or apparent, to act on behalf of the parent." *Royal Indus. Ltd. v. Kraft Foods, Inc.*, 926 F. Supp. 407, 413 (S.D.N.Y. 1996). "[T]he existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentations of the agent because of some misleading conduct on the part of the principal ...." *Ford v. Unity Hosp.*, 299 N.E.2d 659, 664 (N.Y. 1973). Thus, the crux of the inquiry is whether ESI, through words or conduct, made the PBA Plan believe that NPA was transacting business as ESI's agent. *FDIC v. Providence Coll.*, 115 F.3d 136, 141 (2d Cir. 1997) (citing *Hallock v. State*, 474 N.E.2d 1178 (1984)).

While attempting to retain the PBA Plan's business, ESI made statements that could have created such an inference. For example, in one letter, ESI informed the Plan that "NPA's entire pharmacy benefits managements business [was] included in the purchase agreement, and Express Scripts [was] fully committed to retaining and honoring all existing sponsor contracts, including service agreements, products and business schedules .... This assures the continuity of service ... and a seamless transition for [the Plan] and all NPA sponsors." In another letter, ESI's CEO touted his company's ability to "provide [the Plan] with an invaluable continuity in prescription benefit program

management through the combined Express Scripts-NPA operation." Given these statements, the Plan could have reasonably assumed that NPA was conducting business as ESI's agent. From the evidence currently presented, the Court cannot determine whether or not the Plan relied upon this assumption during the final months of the parties' relationship. Therefore ESI's Motion for Summary Judgment on Count I of Plaintiffs' Complaint is partially denied. Under certain factual circumstances, ESI could be held liable for fraudulent actions taken by NPA after April 12, 2002.

## II.    **Consumer Fraud Claims**

### A.    New York's Consumer Protection Act

Plaintiffs next claim that Defendants violated Sections 349 and 350 of New York's General Business Law, also known as the New York Consumer Protection Act (NYCPA). Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. N.Y. Gen Bus. Law § 349(a). And Section 350 declares that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in the state is ... unlawful." N.Y. Gen Bus. L. § 350. This Act provides a private right of action, whereby "any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen Bus. L. § 349(h).

To establish a claim under Sections 349 and 350, "a plaintiff must allege both a deceptive act or practice directed toward consumers and that such act or practice resulted in actual injury to a

plaintiff." *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 818 N.E.2d 1140, 1143 (N.Y. 2004). In addition, the deceptive act or practice "must be misleading to a reasonable consumer." *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 (N.Y. 2002). Defendants contend that Plaintiffs' NYCPA claim fails because the PBA Plan is not a "consumer" within the meaning of the statute.

A plaintiff need not be a consumer to bring a cause of action under Section 349 or 350. *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 344 F.3d 211, 218 (2d Cir. 2003); *Maurizo v. Goldsmith*, 230 F.3d 518, 522 (2d Cir. 2000). However, the NYCPA is not applicable unless the defendant engages in "consumer oriented" conduct. *Gaidon v. Guardian Life Ins. Co.*, 725 N.E.2d 598 (N.Y. 1999). "The critical question ... is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a [trust fund]." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995). If a deceptive practice has "a broader impact on consumers at large," it is considered consumer oriented and is within the ambit of Section 349.[4] *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741 (N.Y. 1995). Private contract disputes unique to the parties are not actionable under this section. *Id.*

The Court could find no caselaw discussing the affect of Sections 349 or 350 on prescription benefit plans. However, there are several cases in which non-consumer plaintiffs brought suit against companies in the health care industry. The principles espoused in those cases make it clear that the

---

[4]The phrase consumers at large, refers to the end-users of a product, or in this case, the New York City Police Officers who receive the benefits of the PBA Plan. *See Fibermark, Inc. v. Brownville Specialty Paper Prods., Inc.*, 419 F. Supp. 2d 225, 240 (N.D.N.Y. 2005).

PBA Plan's injuries did not result from consumer oriented conduct.[5]  For example, in *New York University v. Continental Insurance Company*, the New York Court of Appeals denied a Section 349 claim brought by a university against its insurer because the contract giving rise to the dispute was heavily negotiated by sophisticated entities, specially tailored to the parties to the litigation, and had a multi-million dollar policy limit.  662 N.E.2d 308 (N.Y. 1995).  And in *In re Rezulin Products Liability Litigation*, sponsors of group health benefit plans brought suit against a drug manufacturer for making misrepresentations as to efficacy of its product.  390 F. Supp. 2d 319 (S.D.N.Y. 2005).  In denying the plaintiff's claim under Section 349, the court noted that the representations made to the health benefit plan were intended solely for the plan, not for the end users of the drug.  Because "[a] sophisticated business entity ... acted in an intermediary role, ... the potential that parties in an inferior bargaining position ... would be deceived" was reduced.  *Id.* at 338.  To the contrary, in *Greenspan, M.D. v. Allstate Ins. Co.*, the Southern District of New York allowed a claim by healthcare providers against a large insurance company.  937 F. Supp. 288 (S.D.N.Y. 1996).  The *Greenspan* court noted that a detrimental effect on health care providers alone would not create a cause of action under Section 349.  But because the defendant's actions "deliberately erect[ed] barriers to reimbursement and ... affect[ed] the ability of accident victims to obtain medical

---

[5]In addition, Plaintiffs did not allege sufficient facts to defeat a motion for summary judgment.  To defeat a motion for summary judgment, a plaintiff "must allege facts showing injury or potential injury to the public."  *Greenspan v. Allstate Ins. Co.*, 937 F. Supp. 288, 294 (S.D.N.Y 1996).  In this case Plaintiffs claim that "Defendants have injured the public interest, and ... continue to pose a threat to the public," Plaintiffs' Complaint at ¶ 97, and that "the Defendants' misconduct was aimed at all plans that they administered, an undoubtedly large number, which provide prescription drug coverage to many thousands of beneficiaries," Plaintiffs' Memorandum in Opposition at 25.  However, Plaintiffs never specify how this misconduct injured those beneficiaries (the end users of the prescription benefit plan) or how it would affect the public interest.  Plaintiffs' blanket assertion is insufficient to set forth a cause of action under the NYCPA.  *See Bono v. Monarch Life Ins. Co.*, No. 00-4923, slip op. at 2 (W.D.N.Y. Mar. 27, 2006); *Greenspan*, 937 F. Supp. at 294; *Oswego*, 647 N.E.2d at 744. Conclusory statements will not defeat a motion for summary judgment.

treatment," the company thwarted the purpose of no-fault insurance law and injured the public interest. *Id.* at 294.[6]

Plaintiffs also argue that they have standing to sue under a stream of commerce theory. To maintain a NYCPA suit under this theory, Plaintiffs must show: (1) end consumers recognize NPA/ESI's brand name; (2) NPA/ESI conducts some sort of direct sales to end users; (3) the deceptive acts were aimed at consumers; and (4) consumers in New York were deceived. *Fibermark, Inc. v. Brownville Specialty Paper*, 419 F. Supp. 2d 225, 240 (N.D.N.Y. 2005). But "[t]he only time courts have found indirect interaction with consumers to fall within the purview of [the NYCPA] is when the deceptive acts or practices involve threats to public health or safety." *Id.* at 241 (citing

---

[6]For further caselaw, *compare Securitron Magnalock Corp. v. Shnabolk*, 65 F.3d 256 (2d Cir. 1995) (lock equipment manufacturer's actions affected public interest because it gave false information to a regulatory agency concerned with public safety and reported non-existent dangers), *USAlliance Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 346 F. Supp. 2d 468, 472 (S.D.N.Y. 2004) (disputes between policy holders and insurance companies actionable where there exists "a claim settlement policy designed to deceive certain categories of policy holders"), *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1285 (S.D.N.Y. 1990) (false advertising involving diet and food clearly involves a public harm), *and Vitabiotics Ltd. v. Krupka*, 606 F. Supp. 779 (E.D.N.Y. 1984) (public harm where vitamins contained unlawful substances and packaging was exact copy of competitors mark and trade dress), *with Vitolo v. Mentor H/S, Inc.*, 426 F. Supp. 2d 28 (E.D.N.Y. 2006) (physician could not maintain a cause of action against manufacturer of breast implants because gravamen of complaint asserted personal, not public, harm), *Gucci Amer., Inc. v. Duty Free, Ltd.*, 277 F. Supp. 2d 269, 274 (S.D.N.Y.2003) (trademark infringement plaintiff could not bring § 349 action because "core harm" is to another business and not consumers, despite consumers' purchase of counterfeit goods), *Pfizer, Inc. v. Stryker Corp.*, No. 02-8613, 2003 WL 21660339, at *4 (S.D.N.Y. Jul.15, 2003) ("Although consumers eventually stood to be affected by any defects in the product at issue, the questions whether [seller] told [buyer] the truth when it represented that the business was in compliance with law and whether it intended to comply with its notice and related obligations are essentially private matters."), *and Weiss v. Polymer Plastics Corp.*, 802 N.Y.S.2d 174 (N.Y. App. Div. 2005) (a sophisticated business entity acting as an intermediary between defendant and end-users goes against finding "consumer-oriented" conduct under Section 349).

*Securitron Magnalock Corp.*, 65 F.3d 256 (2d Cir. 1995)).  As Plaintiffs never allege a threat to public health or safety, this theory does not support their claim

In sum, sections 349 and 350 were "intended to empower consumers to even the playing field in their disputes with better funded and superiorly situated fraudulent businesses." *Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 744 (N.Y. App. Div. 1995).  "[T]ransactions involving complex arrangements, knowledgeable and experienced parties and large sums of money ... are different in kind and degree from those that confront the average consumer who requires the protection of a statute against fraudulent practices."  *Genesco Entertainment v. Koch*, 593 F. Supp. 743, 752 (S.D.N.Y. 1984).  Although Plaintiffs allege that Defendants actions harmed a multitude of prescription benefit plans, they never explain how Defendants actions harmed individuals.  The injury at bar was sustained by a trust fund, not by the public at large.  Therefore Plaintiffs cannot maintain a cause of action under the NYCPA.

B.    New Jersey Consumer Fraud Act

Plaintiffs also brought suit for a violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1 *et seq.* (NYCFA).  However, for the reasons stated below, this claim fails as a matter of law.

Under the NJCFA,

[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the

> sale or advertisement of any merchandise ..., whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice ....

N.J. Stat. Ann. § 56:8-2. Any person who is harmed by these unlawful practices may file suit. N.J. Stat. Ann. § 56:8-19. "Person" includes any "corporation, company, trust, business entity or association." N.J. Stat. Ann. § 56:8-1(d). And "merchandise ... include[s] any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J. Stat. Ann. § 56:8-1(c)

The entire thrust of the Act is "pointed to products and services sold to consumers in the popular sense." *Neveroski v. Blair*, 358 A.2d 473 (N.J. Super. Ct. App. Div.1976). Corporations may file suit under the Act as long as the transaction is considered a "consumer transaction" within the meaning of the statute. *Hundred E. Credit Corp. v. Eric Schuster*, 515 A.2d 246, 355 (N.J. Super. Ct. App. Div. 1986). *See also Arc Networks, Inc. v. Gold Phone Card Co.*, 756 A.2d 636, 638 (N.J. Super. Ct. Law Div. 2000) ("the Act has been interpreted to afford protection to corporate and commercial entities who purchase goods and services for use in their business operations"). A consumer transaction is one that "involves the sale of consumer goods[,] regardless of who purchases those goods and for what purpose." *Marascio v. Campanella*, 689 A.2d 852, 856 (N.J. Super. Ct. App. Div. 1997). The inquiry rests solely on the character of the transaction. *J & R Ice Cream Corp. v. Cal. Smoothie Lic. Corp.*, 31 F.3d 1259, 1273 (3d Cir. 1994).

In this case, the character of the transaction at issue was not consumer in nature.[7] In *City of Patterson v. Benecard Servs., Inc.*, the Superior Court of New Jersey addressed this very issue. No. L-005902-02 (N.J. Super. Ct. Law Div. Feb. 11, 2004). Although the decision was unreported, the Court finds its analysis persuasive. In *City of Patterson*, a city filed a class action against ESI and NPA under the NJCFA, making similar allegations to those described in this suit. The court held that the city could not maintain a cause of action because the services provided, which "included such things as administration of plan design/benefits, payments to network pharmacies, maintenance of files, mail out prescription programs and maintenance of records," were "not services available to the general public." *Id.* In this case, NPA and ESI performed the same function for the Plan as it did for the City of Patterson. And like in *City of Patterson*, the services provided by NPA and ESI are not available to the general public, and are not within the ambit of the statute.[8]

C.    Missouri Merchandising Practices Act

---

[7]*See J & R Ice Cream Corp. v. Cal. Smoothie Lic. Corp.*, 31 F.3d 1259, 1273 (3d Cir. 1994) (purchase of franchise not within the scope of the Act); *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 561 (D.N.J. 2002) (maintenance of records is not actionable, when such maintenance is collateral to a contract for sale of goods to a wholesaler); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 469 (D.N.J. 1998) (purchase of wholesale goods for resale not within the scope of the Act); *Arc Networks, Inc.*, 756 A.2d 636 (where long distance phone service was not available to the public, could not bring suit under the Act); and N.J. Admin. Code tit. 13, §§ 45A-1.1 *et seq.* (listing the types of consumer transactions covered by the statute, such as the sale of meat, delivery of household furnishings, the service and repair of home appliances, the sale of animals, home improvements, the sale of kosher and halal foods, automotive sales and repairs, and the sale of health club services).

[8]Plaintiffs also state that the case involves a consumer transaction because the PBA Plan functions for the benefit of "85,000 active and retired New York City police officers." However the Plaintiffs cite no law for this argument and give no further explanation. Therefore, Plaintiffs' argument is without merit.

Plaintiffs' final argument is that Defendants' actions violated the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. §§ 407.010-.307. Under this statute:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce ..., in or from the state of Missouri, is declared to be an unlawful practice.

Mo. Rev. Stat. § 407.020. The MMPA also creates a private right of action, whereby "[a]ny person who purchases or leases merchandise primarily for personal, family or household purposes" may file suit if he is harmed by the acts set forth in Section 407.020.[9] Mo. Rev. Stat. § 407.025.1. Defendants argue that the PBA Plan purchased NPA's services for business purposes, and therefore do not have standing to bring suit under the MMPA. Plaintiffs argue that the pharmacy program is used for police officers, therefore the benefits conferred are for personal purposes.

Plaintiffs' argument is to no avail. A "private cause of action is given only to one who purchases and suffers damage." *Jackson v. Charlie's Chevrolet, Inc.*, 664 S.W.2d 675, 677 (Mo. Ct. App. 1984). And the word purchase "is defined ... as meaning to obtain by paying money or its equivalent." *Id.* (internal citations omitted). One who never "pays anything of value [for a purchase] cannot be said to have suffered damage by reason of any unlawful practice." *Id.* Therefore the PBA Plan is considered the "person" who purchased Defendants' services, not the police officers.

Although the Court can find no cases analyzing the phrase "personal, family or household purposes," given the facts of this case, an extensive discussion is unnecessary. The PBA Plan

---

[9]The term "person" includes "for-profit [and] not-for-profit corporation[s]," and the term merchandise refers to "any objects, wares, goods, commodities, intangibles, real estate or services." Mo. Rev. Stat. § 407.010(4)-(5).

purchased Defendants' services and suffered the damages. The services were not purchased for the Plan's personal, family, or household purposes. Instead, they were purchased for a business purpose: to serve the Plan's clients. Under a plain reading of the statute, the PBA Plan cannot bring suit under MMPA.

## CONCLUSION

The Court concludes that Defendants' Motion for Summary Judgment (#6) will be granted in part and denied in part. Count X of Plaintiffs' Complaint, seeking to hold Defendants liable under New York, New Jersey, and Missouri consumer fraud statutes, shall be dismissed for the reasons stated above. In addition Counts I and IX of Plaintiffs' Complaint, which claim breach of common law fiduciary duty and seek an accounting, are only viable as to fraudulent conduct occurring after April 12, 2002.

Dated this 13th day of September, 2006.

_____
SENIOR UNITED STATES DISTRICT JUDGE