# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

In re EXPRESS SCRIPTS, INC.,  )
PBM LITIGATION  )
  )
  )  **Master Case No. 4:05-MD-01672-SNL**

*This Document Relates to:*

THE CORRECTION OFFICERS',
BENEVOLENT ASSOCIATION OF THE
CITY OF NEW YORK, INC., individually,
and on behalf of all others similarly situated,
     Plaintiff,

  vs.                                             Member Case No.  4:05-CV-01082 SNL

EXPRESS SCRIPTS, INC.,
and NATIONAL PRESCRIPTION
ADMINISTRATORS, INC.,
     Defendants.

## MEMORANDUM

Express Scripts, Inc. and its related entities are defendants in several interrelated cases which were consolidated for coordinated pre-trial proceedings by the Judicial Panel on Multi-District Litigation.  In the instant matter, the Correction Officers' Benevolent Association of the City of New York, Inc. ("COBA") brought this class action lawsuit on behalf of itself, its members, and all others similarly situated, alleging unlawful conduct in connection with Defendants' (Express Scripts, Inc. ["ESI"] and National Prescription Administrators, Inc. ["NPA"]) management of pharmacy benefits plans.  Now, before the Court, Defendants move to dismiss (Document #56, filed July 8, 2005) five of Plaintiff's six claims[FN1] on various grounds. The Court deals with each in turn.

**FN1**.  Plaintiff seeks relief for: Count I: Violation of Section 349 of New York's General Business Law, Count II: Breach of Contract, Count III: Breach of Fiduciary Duty, Count IV: Unjust Enrichment, Count V: Conversion, and Count VI: Breach of the Covenant of Good Faith and Fair Dealing.

## LEGAL STANDARD

In considering a motion to dismiss under Rule 12(b), a court must take all factual allegations in plaintiff's complaint as true, view the complaint in the light most favorable to plaintiff, and dismiss the action only if the complaint demonstrates on its face that there is an insurmountable obstacle to relief. *Alexander v. Peffer*, 993 F.2d 1348, 1349 (8th Cir. 1993) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). A motion to dismiss is not proper merely because plaintiff did not precisely state each element of the offense necessary for recovery, 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1216:120 (1969); nor is it proper solely because the court questions plaintiff's ability to prove all the necessary allegations, *Bennett v. Berg*, 685 F.2d 1053, 1058 (8th Cir. 1982). To survive a motion to dismiss, a complaint need only contain "allegations from which an inference can be drawn that evidence on these material points will be introduced at trial." WRIGHT & MILLER, *supra* at 122-23.

## BACKGROUND

As the background of this case is complex, the Court will briefly recite its interpretation of the relevant facts. This suit is a consolidated putative class action brought by a municipal employee labor union (COBA) on behalf of itself, its members, and all other similarly situated organizations (and their members); consisting of New York City public employees, who had non-ERISA pharmacy benefit plans (or received benefits under such plans) during the relevant time period, and were managed by Defendants. Plaintiff represents the interests of approximately 11,000 active members of COBA, 4,000 retirees, and what is estimated to be potentially 400,000 additional similarly situated New York City employees. (Amended Complaint, Document #55 at ¶¶9, 77-78, filed July 8, 2005.) Such members were responsible for paying their plan premiums and co-payments, and were caused actual injury[FN2] as a result of Defendants' alleged wrongful conduct[FN3].

---

**FN2**. To purchase prescription drugs, plan members pay pharmacies co-payments, and pharmacy benefit management companies ("PBMs"), like Defendants, reimburse pharmacies for the remaining amounts, using the plans' funds or premiums. It is alleged that, while acting as a PBM for Plaintiff, Defendants deprived Plaintiff and Class members of rebates, discounts, and kickbacks to which they were entitled, and inflated the cost of pharmacy benefits; resulting in higher co-payments and plan premiums, and causing injury to similarly situated members, and consumers in general.

**Rebates**.  Plaintiff alleges that Defendants were obligated to negotiate and obtain rebates from pharmaceutical manufacturers on its behalf and pass those rebates to Plaintiff, and/or credit such amounts to the plan's assets, over which Defendants' had authority and control.  Additionally, the parties' contract required Defendants to maintain accurate records of all transactions under the contract, and to grant access to Plaintiff to inspect such records upon reasonable notice.  The parties' contract specifically provides (i) that reimbursement claims be paid from Plaintiff's funds on deposit in Defendants' claims payment account, and (ii) for Defendants to distribute a percentage of the rebates received from manufacturers to Plaintiff.  In spite of these obligations, it is alleged that Defendants wrongfully obtained undisclosed rebates for their own benefit.  (Doc. #55 at ¶¶2, 4, 15, 19-20, 25-34, 95§c; Exhibit B [redacted], "Revised Agreement to Provide Prescription Plan Administration Between [NPA] and [COBA]" ("Contract") at 6 §A, 17 §3.)

**Discounts**.  It is further alleged that, due to the large number of plans and volume of drugs dispensed, retail pharmacies discounted drug costs in exchange for inclusion into Defendants' network.  The arrangement involved a reimbursement formula in which pharmacies would provide certain discounts for specific drugs, and Defendants were required to then pass such discounts to the plans in the form of lower reimbursement charges.  Rather, it is alleged that, Defendants wrongfully diverted and retained a portion of undisclosed and/or misappropriated discounts for their own benefit.  Plaintiff's complaint states that "the true discount leveraged from the retailer pharmacies by Defendant is not revealed to Plaintiff."  (Doc. #55 at ¶¶2, 4, 15-16, 18, 23-26, 36, 38-40.)

**Kickbacks**.  Defendants allegedly engaged in a drug preference program, wherein Defendants' use of a formulary, or list of drugs, was designed to encourage plan members to request those drugs selected by Defendants to be the most cost-effective and clinically efficacious.  Defendants would charge lower co-payments for formulary drugs, and, when possible, engage in "switching" more expensive drugs with cheaper, generic alternatives.  Defendant provided training to pharmacists and other personnel, and encouraged physicians, to use formulary drugs by representing "that prescribing these will promote the quality of care, better drugs, and lower cost."  Because formulary drugs were requested and dispensed at a substantially higher rate than non-formulary drugs, manufacturers had a great incentive to have their drugs on the list.  Therefore, manufacturers whose drugs were too expensive for inclusion, began subsidizing the costs by paying rebates to Defendants.  However, these rebates, referred to in the complaint as "kickbacks," were not used to set off the cost of the more expensive drugs placed on formulary, but instead were secretly obtained and withheld by Defendants.  (Doc. #55 at ¶¶52-56, 58.)

**Inflating Drug Costs**.  First, in exchange for the manufacturers' collusion with respect to formulary rebates, Defendants allegedly helped manufacturers establish and publish inflated average wholesale prices ("AWP") for drugs.  Traditionally, AWPs are reported and released in industry publications, serve as benchmarks for the wholesale prices at which drugs are sold to pharmacies and physicians, and are used in drug reimbursement and pricing methodologies in health plans.  Plaintiff alleges that, in failing to apply the kickbacks against the AWPs, the prices of drugs charged to plans increased.  (Doc. #55 at ¶35.)

Next, Defendants allegedly "steered" plan members away from brand name drugs

subject to generic competition, toward other brand name drug produced by the same manufacturer. Such practices benefitted Defendants in the form of secret kickbacks and increased drug revenue, while injuring Plaintiff through higher drug prices, and other costs associated with monitoring and ensuring the new drugs' efficacy, and potential side effects. (Doc. #55 at ¶¶58-63.)

Lastly, Plaintiff alleges that Defendants inflated the costs of generic drugs. The complaint describes that their generic substitution program required Defendants to substitute, whenever possible, more expensive, brand name drugs with equally-effective, generic drugs. Without the program, plan members were charged extra for brand name drugs if generics were available. The program called for Defendants, when suitable generics were available, to establish a maximum amount ("MAC") charged to plans regardless of whether a brand name or generic drug was dispensed. Plaintiff claims that Defendants failed to implement this program by (i) failing to set MACs where possible, (ii) paying pharmacies lower MACs while charging plans higher plan members non-MAC prices and retaining the difference for their own benefit, (iii) setting MACs but still charging plans brand name prices for certain drugs, and (iv) inflating the MACs of certain generic drugs by using lower discount rates. These practices led to plans members being charged inflated co-payments and drug costs. (Doc. #55 at ¶¶41-51.)

**FN3**. It is alleged that "[Defendants engaged] in a scheme of deceptive business practices, for [their] own benefit and to the detriment of Plaintiff and the Class, by, among other things, (a) misappropriating undisclosed rebates obtained from pharmaceutical manufacturers through the volume of the plans, by disguising the rebates as various plan administration fees; (b) misappropriating undisclosed discounts obtained from pharmacies; (c) improperly manipulating and inflating the costs of generic drugs; (d) receiving and retaining kickbacks pursuant to secret agreements with pharmaceutical manufacturers to list certain drugs on its formulary and to favor certain drugs by the practice of 'switching,' notwithstanding the availability of cheaper, therapeutically-equivalent drugs and the high costs of switching; and (e) charging more than the contract rate for prescription drugs purchased by Plaintiff and the Class." (Doc. #55 at ¶2.)

## CHOICE OF LAW

This is a diversity action filed in the Supreme Court of New York, removed to the United States District Court for the Southern District of New York, and transferred to the United States District Court for the Eastern District of Missouri for consolidated pretrial proceedings.

Where federal questions are at issue, "consolidated cases are controlled by the law of this circuit, rather than that of the various circuits in which they were first filed." *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1171 n.4 (8th Cir. 1998); *see also In re Temporomandibular Joint (TMJ) Implants Recipients v. E.I. Du Pont De Nemours & Co.*, 97 F.3d 1050, 1055 (8th Cir. 1996). Accordingly, the Court will apply Eighth Circuit precedent, as opposed to the Second Circuit caselaw cited throughout the litigants' memoranda. As to the state law issues[FN4], a court generally applies the forum state's choice of law principles. *See Klaxon Co. v. Stentor*

*Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941); *Stricker v. Union Planters Bank, N.A.*, 436 F.3d 875, 877 (8th Cir. 2006). However, when a transferee court presides over a consolidated diversity action, it must apply the choice of law rules of the jurisdiction in which each case was originally filed. *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). Therefrom, New York choice of law rules apply.

> **FN4**. As Plaintiff contends, the plans at issue are non-ERISA health plans by virtue of the fact that they are governmental plans, as defined in 29 U.S.C. § 1002(32), and are therefore governed by state law. *See* 29 U.S.C. § 1003(b)(1).

New York applies distinct choice of law approaches depending upon the claims at issue. *Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.*, 414 F.3d 325, 336 (2d Cir. 2005). In those cases involving contract claims, New York applies the "center of gravity theory." *Id.* (citing *Matter of Allstate Ins. Co.*, 81 N.Y.2d 219, 233-34 (N.Y. 1993)). For tort claims, New York courts apply an interest analysis. *Hughes v. LaSalle, Bank, N.A.*, 419 F.Supp.2d 605, 617 (D.N.Y. 2006).

In reviewing contract claims, the "center of gravity" test includes various factors to determine which state has the most significant relationship to the transaction at issue. *American Centennial Ins. Co. v. Sinkler*, 903 F.Supp. 408, 412 (D.N.Y. 1995). Under this approach, courts consider "the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *Memorial Drive Consultants, Inc. v. ONY, Inc.*, Nos. 01-7353, 01-7387, 2002 WL 226860, at *5 (2d Cir. Feb. 14, 2002) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997)).

Applying the "center of gravity" test to the facts in the present case, the Court finds that New York bears the most significant relationship to the transaction. First, as for the place of contracting, neither party state where the contract was entered into; however, the contract lists New Jersey as the place of execution. (Contract at 8.) Absent any evidence to the contrary, the Court assumes this statement to be true. Second, as for negotiation and performance, the complaint is devoid of any allegation concerning where the contract was negotiated. The Court finds it apparent, however, that performance was to take place, and the subject matter was located, in New York. More specifically, the contract's purpose was for a PBM to provide

pharmacy plan benefits to thousands of municipal union employees purchasing pharmaceutical drugs in New York; the plan members were billed in New York; and it is the purchase of these drugs in New York, which led to the accrual of rebates, discounts, and kickbacks, resulting in Defendants' alleged misconduct. Finally, as to the domicile of the parties, Plaintiff is domiciled in New York[FN5], and represents the interests of thousands of plan members domiciled in New York. (Doc. #55 at ¶9.) As to Defendants, during all times relevant here, ESI and NPA were domiciled in Missouri[FN6]. Balancing all of these factors, the Court concludes that New York has the most significant relationship to the transaction and the parties, and the Court shall apply New York law to the state law issues dealing with the contract claims alleged, e.g., breach of the implied covenant of good faith and fair dealing. *See Ackerley Media Group, Inc. v. Sharp Electronics Corp.*, 170 F.Supp.2d 445, 450-51 (D.N.Y. 2001).

**FN5**. COBA's principal place of business is New York, New York. (Doc. #55 at ¶9.)

**FN6**. Although NPA was headquaretered in New Jersey when it entered into the contract with Plaintiff (Doc. #55 at ¶11), ESI acquired NPA in 2002 and has since been headquartered in Maryland Heights, MO. *See Weisberg v. Layne-New York Co., Inc.*, 132 A.D.2d 550, 552 (N.Y. App. Div. 1987) (for choice of law purposes, a corporation is domiciled where it maintains its principal place of business, or where it may be said that its corporate presence is more pronounced).

As to the tort claims, New York courts apply the law of that jurisdiction which, "'because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.'" *Hughes,* 419 F.Supp.2d at 617 (quoting *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (N.Y. 1993)). In assessing a jurisdiction's interest in the litigation, courts weigh (i) significant contacts, and (ii) whether the purpose of the law is to regulate conduct or allocate loss. *Hughes*, 419 F.Supp.2d at 617 (citing *Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 522 (N.Y. 1994)).

Here, during all relevant times, the parties were domiciled in different states, and Plaintiff alleges claims involving conduct-regulating laws; therefore the locus of the tort (location where the tort was committed) is determinative of the choice of law. *See*, *e.g.*, *Champlain Enterprises, Inc. v. U.S.*, 945 F.Supp. 468, 472 (D.N.Y. 1996); *Hughes*, 419 F.Supp.2d at 617; *Weisberg*, 132A.D.2d at 552. In addition to New York's significant contacts to this transaction (*supra*); as the place where the torts were allegedly committed, New York has the greater public policy interest in "ensuring that those who conduct business within its borders

will be called upon to compensate those whom they have injured while so engaged pursuant to its statutory scheme." *Weisberg*, 132 A.D.2d at 552. Accordingly, New York law applies to the state law issues dealing with the tort claims alleged, e.g., breach of fiduciary duty, unjust enrichment, and conversion.


# **DISCUSSION**

## **COUNT I: VIOLATION OF NEW YORK GBL § 349**

Plaintiff seeks relief under Section 349 of New York's General Business Law. Under this section, deceptive acts or practices in conducting business or furnishing services is unlawful. N.Y. Gen. Bus. Law § 349(a). Thereunder, a party injured as a result of such conduct may bring a private action to recover damages. *Id*. at § 349(h).

Defendants move the Court to dismiss Plaintiff's claim under this section for failure to show that the alleged conduct was consumer-oriented. (Doc. #57 at 4-6, filed July 8, 2005.)

To state a claim for violation of Section 349, a plaintiff must allege that the challenged act (1) was consumer-oriented, (2) was deceptive in a material way, (3) was capable of misleading a reasonable consumer acting reasonably under the circumstances, and (4) caused an actual injury. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25-26 (N.Y. 1995)). Further, in order to survive a motion to dismiss, the complaint must set forth specific deceptive acts or practices, rather than conclusory allegations, that form the basis of plaintiff's claim. *USAlliance Federal Credit Union v. CUMIS Ins. Soc., Inc.*, 346 F.Supp.2d 468, 472 (D.N.Y. 2004) (citing *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, 326 F.Supp.2d 434, 438-39 (D.N.Y. 2004) *and Grand Gen. Stores v. Royal Indem. Co.*, No. 93 Civ. 3741, 1994 WL 163973, at *3-4 (D.N.Y. Apr. 22, 1994)).

To be consumer-oriented, the conduct alleged must affect the public interest in New York. *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995). *See, e.g.*, *New York v. Feldman*, 210 F.Supp.2d 294, 301 (D.N.Y. 2002); *Oswego Laborers'*, 85 N.Y.2d at 25 (if practice has "a broader impact on consumers at large," it is considered consumer-oriented); *accord Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324-25 (N.Y. 2002).

Plaintiff, representing the interests of potentially over 400,000 municipal union employees of the City of New York, alleges that Defendants' conduct "caused substantial

aggregate damage to many public employees and consumers," including Plaintiff. (*supra* notes 2 & 3; Doc. #55 at ¶¶86-87.) The complaint details facts alleging that "Defendant[s'] misrepresentations and omissions (a) deceived [sic] Plaintiff and the members of the Class, and (b) induced [sic] Plaintiff and members of the Class to pay more in insurance premiums and co-payments than they should have." (*Supra* notes 2 & 3; Doc. #55 at ¶86.) *See Feldman*, 210 F.Supp. at 301 ("[C]ourts have found sufficient allegations of injury to the public interest where plaintiffs plead repeated acts of deception directed at a broad group of individuals.").

Viewing the allegations in the light most favorable to Plaintiff, there is sufficient evidence that Defendants affected New York City consumer-patients by colluding to raise the cost of drugs listed on their formularies, and the AWP's of drugs in general; and by misleading physicians regarding the cost-effectiveness and clinical efficacy of Defendants' preferred drugs. (*Supra* note 2 at ¶¶5-7.) Additionally, Defendants' purported standard contract (Doc. #55 at ¶64), coupled with its huge presence in, and relationships throughout, the pharmaceutical industry[FN7,] lead this Court to find that Defendants' conduct may have affected the entirety of its vast customer base, and therefore had a broad impact on New York City consumers at large. *See Oswego Laborers'*, 85 N.Y.2d at 26-27 (where the record indicates that defendant dealt with plaintiff's representative as any of its other customers and furnished plaintiff with standard documents which were presented to all its customers, the transaction was consumer-oriented in that it potentially affected similarly situated consumers).

> **FN7.** It is alleged that "[m]ore than 56,000 retail pharmacies, representing more than 99% of all retail pharmacies in the United States, participate in one or more of [ESI's] networks. In the aggregate, [ESI] manages the pharmacy benefits of over 50 million people in North America." Also, "[ESI] processed 378.9 million in retail pharmacy claims and dispensed 32.3 million mail pharmacy prescriptions ∴ in 2003." "[ESI] oversees a consumer network of 50 million people and processes 450 million prescriptions a year– 1 out of every 6." Further, prior to its acquisition by ESI, NPA was "the largest privately-held, full-service PBM." In announcing its acquisition, ESI released that NPA "manages approximately 2.5 billion in annual drug spending [sic] primarily for union and government populations in the Northeast, processes approximately 42 million retail network claims and 3 million pharmacy claims, through two mail facilities ∴ [and] has developed a leading position serving union and government populations." (Doc. #55 at ¶¶11, 14, 21-22 & 37.)

Defendants are correct in their assertion that private contract disputes unique to the parties, or "single shot transactions," do not fall within the ambit of Section 349. *Oswego Laborers'*, 85 N.Y.2d at 25 (citing *Genesco Entertainment v. Koch et al.*, 593 F.Supp. 743, 752

(D.N.Y. 1984)).  Such transactions "involving complex arrangements, knowledgeable and experienced parties and large sums of money ∴ are different in kind and degree from those that confront the average consumer who requires the protection" of Section 349.  *Genesco Entertainment*, 593 F.Supp. at 752.  However, the existence of complexity, and the experience and sophistication to handle the same, will not necessarily operate to preclude the application of Section 349.

Here, although Plaintiff is one of the two largest law enforcement labor unions in New York City, and therefore arguably boasts a great deal of sophistication and bargaining power in relation to Defendants, the deceptive acts alleged and at issue here, combined with Defendants' purported leverage over the pharmaceutical industry (*supra* note 7), put the parties on unequal footing.  Section 349 "was intended to empower consumers; to even the playing field in their disputes with better funded and superiorly situated fraudulent businesses." *Teller v. Bill Hayes, Ltd.,* 213 A.D.2d 141, 148 (N.Y. App. Div. 1995).  Further, although the situation arguably involves a private contract between the parties, the potential effect of Defendants' alleged acts and practices on the City of New York are vast and immeasurable at this pre-discovery stage. Whether the contract offered by Defendants was standard, or how great the effects of Defendants' alleged acts and practices will be in the aggregate, has yet to be determined.  At this instant, the Court finds that the gravamen of the complaint is extensive injury to New York City's public interest, and therefore a motion to dismiss Plaintiff's claim is improper.  *See Securitron Magnalock*, 65 F.3d at 264 (citing *Azby Brokerage, Inc. v. Allstate Ins. Co.*, 681 F.Supp. 1084, 1089 n.6 (D.N.Y. 1988)).

For more caselaw[FN8], *see Riordan v. Nationwide Mut. Fire Ins. Co.*, 756 F.Supp. 732, 739-40 (D.N.Y. 1990) (Although plaintiff's alleged injury resulted from defendant's breach of its obligations under their specific contract, defendant's policy of engaging in deceptive acts or practices was designed to deceive the public at large.  Therefore, if proven, the public injury "is unquestionable since the alleged deceptive practices go to the very essence of the services [defendant] provides to the public on a grand scale, as well as its obligation to deal with the public in good faith."), *aff'd in relevant part*, 977 F.2d 47 (2d Cir. 1992); *Securitron Magnalock*, 65 F.3d at 264-65 (although a contractual dispute, defendants gave false information concerning non-existent dangers to regulatory agency primarily concerned with public safety, caused the cancellation of a different awarded contract, and caused the agency's attention to be diverted

from other public safety activities); *Leider v. Ralfe*, No. 01 Civ. 3137, 2004 WL1773330, at *8 (D.N.Y. July 30, 2004) (conduct was consumer-oriented where plaintiffs alleged injury arising from defendant's collusive, anti-competitive and misleading practices aimed at inflating the price of diamonds); *c.f. Feldman*, 210 F.Supp.2d at 301-02 (public interest element sufficiently pled where defendants engaged in a scheme to manipulate public stamp auctions, and injured parties included unsophisticated, individual sellers).

**FN8**. Courts have repeatedly found sufficient allegations of injury to the public interest where defendant's conduct is directed at a broad group of individuals. *See, e.g., Skibinsky v. State Farm Fire and Casualty Co.*, 6 A.D.3d 975, 976 (N.Y. App. Div. 2004) (During early pre-discovery phase, plaintiff sufficiently pled her Section 349 claim, where the complaint stated that defendants engaged in the recurring sale of policies to consumers seeking more inclusive "builder's risk" policies, and therefore intentionally misrepresented to plaintiff, and the public, the nature of coverage that was being provided.); *In re Methyl Tertiary Butyl Ether Prod. Liability Litig.*, 175 F.Supp.2d 593, 631 (D.N.Y. 2001) (New York public interest affected where defendants were in the business of providing gasoline, which contained a known carcinogen, to New York consumers.); *City of New York v. Coastal Oil New York, Inc.*, No. 96 Civ. 8667, 1998 WL 82927, at *7 (D.N.Y. Feb. 25, 1998) (complaint properly alleged defendant's dissemination of misleading prices to other oil purchasers, having broad impact on consuming public at large); *Vitabiotics Ltd. v. Krupka,* 606 F.Supp. 779, 785 (D.N.Y. 1984) (defendant's sale of 1500 cartons of vitamins containing unlawful substances and promoted through false and/or misleading statements, established public harm).
    *Compare with Vitolo v. Mentor H/S, Inc.*, 426 F.Supp.2d 28, 31, 34 (D.N.Y. 2006) (gravamen of complaint was harm to plaintiff's business as opposed to the public at large, where physician's complaint focused on personal loss suffered to him and his business); *In re Rezulin Products Liability Litig.*, 390 F.Supp.2d 319, 337 (D.N.Y. 2005) (on motion for summary judgment, alleged conduct was unique to the parties, not applied generally to consumers); *Pfizer, Inc. v. Stryker Corp.*, No. 02-8613, 2003 WL 21660339, at *3-4 (D.N.Y. July15, 2003) (consumer-oriented threshold unmet where parties' interests were adequately represented in negotiations, insurance policy was uniquely tailored, and transaction entailed a large amount of money).

This case is different from its member case decided earlier this year, *In re Express Scripts, Inc., Pharmacy Benefits Management Litigation*, No. 4:05-MD-01672, 2007 WL 1796224, at *9-10 (D.Mo. June 20, 2007), wherein this Court dismissed a Section 349 claim brought on behalf of New York State union employees who received benefits through the New York State Health Insurance Program, in that their interests were adequately represented by the Department of Civil Service in negotiations with Defendants. *See Weiss v. Polymer Plastics Corp.*, 802 N.Y.S.2d 174, 176 (N.Y. 2005) (a sophisticated business entity acting as an intermediary between defendant and end-users goes against finding consumer-oriented).

*Compare also In re Express Scripts, Inc., Pharmacy Benefits Management Litigation*, No. 4:05-MD-01672, 2006 WL 2632328, at *8 (D.Mo. Sept. 13, 2006), where this Court granted Defendants' motion for summary judgment as to plaintiff's Section 349 claim, in that Defendants' acts were not consumer-oriented, and plaintiff failed to allege specific facts showing public injury. *See Greenspan v. Allstate Ins. Co.*, 937 F.Supp. 288, 294 (D.N.Y. 1996) (At the summary judgment stage, conclusory statements will not suffice.); *accord Oswego Laborers'*, 647 N.E.2d at 25, 27; *and Skibinsky*, *supra* note 8 at 976 ("The battle over whether plaintiff can meet her obligation of a 'threshold showing that [her] claim was predicated upon a deceptive act or practice that was consumer oriented' is best reserved for a motion for summary judgment after discovery.") (quoting *Egan v. New York Care Plus Ins. Co.*, 277 A.D.2d 652, 653 (N.Y. App. Div. 2000)) .

Accordingly, the Court **HEREBY GRANTS IN PART** Defendants' motion to dismiss Count I. Plaintiff may proceed on its Section 349 claim but must forego the award of any sum other than actual damages. *Leider*, at *8 (class may only recover actual damages for Section 349 claim); *accord Burns v. Volkswagen of America, Inc.*, 118 Misc.2d 289, 292-93 (N.Y. Sup. Ct. 1982).


## COUNT III. BREACH OF FIDUCIARY DUTY

Turning to the next argument, Defendants ask the Court to dismiss Plaintiff's claim for breach of fiduciary duty in that Plaintiff has failed to demonstrate the existence of a fiduciary relationship, and the claim is duplicative of Plaintiff's breach of contract claim. (Doc. #57 at 6.)

To state a claim for breach of fiduciary duty, a plaintiff must first establish the existence of a fiduciary relationship between the parties. *Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F.Supp. 411, 425 (D.N.Y. 1992). A fiduciary relationship exists where one party reposes confidence in another, and there is resulting superiority and influence on the other. *Id*. at 426; *see also Anonymous v. CVS Corp.*, 188 Misc.2d 616, 620 (N.Y. Sup. Ct. 2001); *c.f. Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 168 (N.Y. App. Div. 1987) (Fiduciary relationship exists " 'when one ∴ is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.' ") (quoting RESTATEMENT (SECOND) OF TORTS § 874 cmt.(a) (1977)).

Defendants argue that, apart from the contract, no separate duty arose among the parties. (Doc. #57 at 6.) Parties entering into contract pursuant to a business relationship do not generally give rise to a fiduciary relationship, absent extraordinary circumstances, because such parties deal with each other at arm's length. *Valjean Mfg., Inc. v. Michael Werdiger, Inc.*, No. 03 Civ. 6185, 2004 WL 1948752, at *4 (D.N.Y. Sept. 2, 2004). However, a plaintiff may establish the presence of a duty separate from that arising in contract by demonstrating that the parties were not dealing with each other at arm's length, or by pleading facts of extraneous circumstances. In such cases, a breach of the contractual obligation may also constitute a breach of the resulting duty. *Mandelblatt*, 132 A.D.2d at 167-68 (citing *Meyers v. Waverly Fabrics*, 65 N.Y.2d 75, 80 n.2 (N.Y. 1985)). *See also*, *e.g.*, *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, No. 03 Civ. 1537, 2003 WL 23018888, at *15-16 ( (D.N.Y. Dec. 22, 2003); *accord Compania*, 785 F.Supp. at 425-27; *ADT Operations, Inc. v. Chase Manhattan Bank, N.A.*, 173 Misc.2d 959, 963 (N.Y. Sup. Ct. 1997) (courts look to such factors as parties' intent, length of the relationship, financial interdependence, and the sharing of confidential and proprietary information);[FN9] *c.f. In re Kressner*, 206 B .R. 303, 312-13 (D.N.Y. 1997).

> **FN9**. *See also*, *e.g.*, *Sergeants Benev. Ass'n Annuity Fund v. Renck*, 796 N.Y.S.2d 77, 79-81 (N.Y. App. Div. 2005); *Bouquet Brands Div. of J & D Food Sales, Inc. v. Citibank, N.A.*, 470 N.Y.S .2d 733, 744 (N.Y. App. Div. 1983); *Henneberry v. Sumitomo Corp. of Am.*, 415 F.Supp.2d 423, 460 (D.N.Y. 2006).

In *Compania*, 785 F.Supp. at 415, 425, plaintiff's allegations that it "reposed trust and confidence" in, and relied upon, defendant to provide plaintiff with the best rates, based on its longstanding relationship and previous business transactions, was not sufficient to give rise to a fiduciary relationship. The evidence in *Compania* adduced that both parties were sophisticated companies, run by individuals knowledgeable about the subject matter at issue; there was no reason to conclude that the parties were not dealing at arm's length; and the agreement at issue was not a result of unequal bargaining power or influence. *Id*. at 426. Instead, the court found an at-will relationship between a buyer and seller "designed to further the interests of the respective parties," in which both parties had equal access to monitor the exchange rates at issue. *Id*. at 426-27.

Here, the Court finds that Plaintiff sufficiently alleges the existence of an additional, independent duty for purposes of a motion to dismiss. First, Plaintiff alleges facts evidencing unequal bargaining positions. Specifically, the complaint states that Defendants possessed or

purported to possess superior expertise on which Plaintiff relied; and in reliance thereof, Plaintiff reposed trust and confidence in Defendants to manage its plan. (Doc. # 55 at ¶94.) As Defendants point out, superior knowledge alone does not create a fiduciary relationship. (Doc. # 57 at 7.) *See Board of Managers of Highpoint Condominium v. East/West Venture*, 278 A.D.2d 55, 56 (N.Y. App. Div. 2000). However, the complaint illustrates that Defendants were well-positioned in the pharmaceutical industry (*supra* note 7); and were arguably more effective at entering into relationships with pharmaceutical manufacturers and retail pharmacies, and negotiating on their clients' behalf. In that way, Plaintiff, and others similarly situated, relied on Defendants' established industry presence.

Next, Plaintiff sufficiently establishes the existence of extraneous circumstances giving rise to a fiduciary relationship. Specifically, the complaint cites Defendants' marketed assurances[FN10], improper acts (*supra* notes 2 & 3), and secret relationships and agreements. Combining these allegations with the unavailability of public information regarding drug prices, rebates, and discounts, and Defendants' alleged refusal to fully disclose such information; the Court finds adequate basis for the existence of a fiduciary relationship.

**FN10**. Plaintiff's complaint states that Defendant ESI marketed that (i) "[W]e pledge to ∴ [a]lways align our interest with those of our clients and their members"; (ii) "you can rely upon a relationship that is honest and will not be compromised ∴ one that delivers recommendations aligned with your interests." (Doc. #55 at ¶24.)

In its 2003 annual report, Plaintiff claims that "[ESI] claimed that it 'work[s] with clients, manufacturers, pharmacists and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit, and to improve members' health outcomes and satisfaction' by performing functions such as 'evaluating drugs for price, value and efficacy in order to assist clients in selecting the most cost-effective formulary,' 'leveraging volume to deliver discounts to clients,' 'promoting the use of generics and low-cost brands,' and 'offering cost-effective mail pharmacy services which result in drug-cost saving for plan sponsors and co-payment savings for members.' " (Doc. #55 at ¶23.)

Plaintiff alleges that a spokesperson for Defendant ESI stated "We develop clinically sound formularies based on the evaluation of independent physicians... We aggressively promote generic drugs and lower cost brand-name drugs and never switch to high cost drugs ..." (Doc. # 55 at ¶57.)

At this stage of the litigation, allegations of the parties' unequal bargaining positions, coupled with evidence of extraneous circumstances, is sufficient to prove the existence of a fiduciary relationship[FN11]. *Compare with*, *e.g.*, *Board of Managers*, 278 A.D.2d at 55-56 (court

did not infer the existence of a fiduciary relationship where, even though defendant had superior experience and knowledge concerning the subject matter at issue, the evidence did not dispute that the parties were dealing with each other at arm's length) (citing *Societe Nationale D'Exploitation v. Salomon Bros. Intl.*, 251 A.D.2d 137, 138 (N.Y. App. Div. 1998)); *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (no position of trust or special confidence beyond that imposed by contract where no facts revealed that defendant was relied upon for advice or the exercise of judgment based on superior information or professional expertise); *Mia Shoes, Inc. v. Republic Factors Corp.*, No. 96 Civ. 7974, 1997 WL 525401, at *2 (D.N.Y. Aug. 21, 1997) (claim alleging breach of fiduciary duty dismissed where contracting parties had comparable bargaining power).

> **FN11**.  Defendants' argument that Plaintiff is a very large labor union and therefore arguably exerts great sophistication and bargaining power itself is negated by the combination of Defendants' purported industry position and their wrongful acts.

Next, the complaint states that Defendants were fiduciaries in that they exercised discretionary functions on behalf of Plaintiff in their authority, or control, over the management of the plans, and the disposition of the plan's assets.  (Doc. # 55 at ¶95.)  Specifically, it is alleged that Defendants exercised discretion in negotiating drug costs and rebates with drug manufacturers, negotiating claims reimbursement and discounts with retail pharmacies, administering and managing the plans and their respective assets, deducting costs from and crediting rebates or discounts to plan assets, determining which drugs to include in their formulary, and determining which drugs to include in their drug preference or switching programs.  (*Id.*)

The Court agrees with Defendants in that a fiduciary duty is not owed where there is no duty distinct from, or in addition to, that arising from the contract (Doc. # 57 at 8).  *See Layden v. Boccio*, 686 N.Y.S.2d 763, 764 (N.Y. App. Div. 1998).  However, the complaint states that Defendants' contractual obligations depended upon their ability and success in negotiating agreements on behalf of Plaintiff.  Although the contract[FN12] does not address this responsibility, upon the contract's formation, it is alleged that Defendants undertook to perform the same. Therefore, Defendants' wrongful acts in the negotiation, and subsequent performance, of the agreements at issue are separate from their failure to fulfill the express contractual obligations. *See Banco Espirito*, at *16.  *See also*, *e.g.*, *Crabtree v. Tristar Automotive Group, Inc.*, 776 F.Supp. 155, 166-67 (D.N.Y. 1991) (Although defendant was obligated to use reasonable efforts

to maintain the books and records, and its duties were arguably described by the contract's terms, the court determined that the final price realized by plaintiff depended on how successfully defendant ran the business, and therefore plaintiff trusted in and relied upon defendant as a fiduciary.). *C.f. Mandelblatt*, 132 A.D.2d at 167-68 (fiduciary duty sufficiently stated where consultant allegedly disparaged and injured retail chain's business opportunity while under a duty, as a highly paid consultant, to give advice to and act for retail chain's benefit.). *Compare Bridgestone*, 98 F.3d at 20 (no additional duty where defendant had little discretion to exercise his obligations under the contract and whatever trust and confidence was placed in him had solely to do with his carrying out his contractual obligations).

> **FN12**. *See Stahl v. U.S. Dept. of Agriculture*, 327 F.3d 697, 700 (8th Cir. 2003) (in cases involving contracts, courts may examine contract documents when deciding a motion to dismiss).

Next, the Court disagrees with Defendants' argument that their alleged administration and management of the plans and assets did not give rise to a fiduciary duty. The parties' contract called for Plaintiff to deposit funds into their claims payment account maintained by Defendants (Contract at 6), from which Defendants would pay for the members' claims and services (Contract at 5-7). Although the contract specified which drugs would receive coverage, as well as the methods of determining drugs' costs and prices, the amounts paid by Defendants and received from the providers depended upon the ability, success, and full disclosure of Defendants' negotiations with the plans. Therefore, the Court finds sufficient evidence that the parties' relationship exceeded the scope of the contract[FN13]. *See CBS, Inc. v. Ahern,* 108 F.R.D. 14, 25 (D.N.Y.1985) (construing plaintiff's allegations liberally, fiduciary duty may arise where money held in "special accounts" to be "invested and reinvested from time to time" in securities selected by investment advisor). *Compare Valjean Mfg.*, at *4 -5 (court dismissed breach of fiduciary duty claim even though defendant had control of the "recordkeeping, accounting, and collection of monies due [plaintiff]," where plaintiff did not allege facts of extraordinary circumstances and the parties' agreement disclaimed the existence of a fiduciary or quasi-fiduciary relationship).

> **FN13**. RESTATEMENT (SECOND) OF TRUSTS § 2 (1959) defines "trust" as "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it."

Finally, Defendants argue that Plaintiff's claim must be dismissed as duplicative of its breach of contract claim (Doc. # 57 at 9). *See William Kaufman Org., Ltd. v. Grarham & James, LLP*, 269 A.D.2d 171, 173 (N.Y. App. Div. 2000) ("A cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand."). Here, the contract required Defendants to pay claims on behalf of plan members by deducting such amounts from Plaintiff's claims payment account, maintained by Defendants (Contract at 6 §A & 5 §B). The contract additionally enumerated how Defendants would distribute proceeds received in connection with the formulary and rebate programs (*id*. at 17 §3), and how drugs' costs and prices were calculated (*id*. at 3, 4 §J & 15-16). Further, Defendants were responsible for the furnishing of services, including: (i) developing, and continually maintaining and updating its formulary, (*id*. at 4 §J & 17 §4); (iii) providing detailed rebate billing to all providers on Plaintiff's behalf (*id*. at 17 §4); and (iv) providing detailed reports to the plans containing rebate payments, program costs, quality control, etc. (*id*. at 4 §§ I, K, L, N, O; 5 §A; 6 §§ A, B; 7 ¶2 & 17 §4).

The Court agrees that each of Plaintiff's allegations is in some way addressed by the parties' contract. However, in its performance of the contract, Defendants owed additional, independent duties, e.g., effectively negotiating discounts and rebates on behalf of the plans, and delivering such amounts to the plans; and lowering drug prices by applying discounts and rebates against providers' charges. At this stage of the litigation, the Court sees no insuperable bar to relief. "[T]he existence of a fiduciary duty depends on the facts of a particular relationship and thus is not usually dismissed in a 12(b)(6) motion." *Valjean Mfg.*, at *4 (citing *Boley v. Pineloch Assocs.,* 700 F.Supp. 673, 680-81 (D.N.Y. 1988)).


## COUNT IV: UNJUST ENRICHMENT

Defendants next ask the Court to dismiss Plaintiff's claim of unjust enrichment as duplicative of its claim for breach of contract.

A plaintiff alleging a claim for unjust enrichment must establish that (i) the defendant was enriched; (ii) the enrichment was at the plaintiff's expense; and (iii) equity and good conscience demand that the defendant return the money or property to the plaintiff. *Golden Pacific Bancorp v. F.D.I.C.*, 273 F.3d 509, 519 (2d Cir. 2001) (citing *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 79 (2d Cir. 1986)).

Here, Plaintiff asserts that Defendants were unjustly enriched as a result of (1) inducing Plaintiff to overpay co-payments, insurance premiums, and pharmacy benefit costs; and (2) secretly retaining undisclosed rebates, discounts, and kickbacks to which Plaintiff was entitled. (Doc. #55 at ¶¶ 99-100.)

Unjust enrichment seeks to afford a remedy in quasi contract. Therefore, the existence of a valid and enforceable contract governing the subject matter at issue ordinarily precludes recovery for events arising out of the same. *Katz v. American Mayflower Life Ins. Co. of New York*, 14 A.D.3d 195, 201 (D.N.Y. 2004). That having been said, recovery for unjust enrichment may be available if a plaintiff seeks recovery for services and benefits conferred outside the contract. *Hotel Aquarius B.V. v. PRT Corp.*, No. 92 Civ. 4498, 1992 WL 391264, at *5 (D.N.Y. Dec. 22, 1992) (citing *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (N.Y. 1987)).

Here, Plaintiff's breach of contract claim alleges, in relevant part, that Defendants were paid a monthly, administrative fee in return for reducing and controlling prescription drug costs; specifically (1) obtaining rebates and discounts and passing them to Plaintiff; and (2) further limiting the cost of generic drugs by implementing generic substitution programs and the use of formularies. (Doc. #55 at ¶90.) In allegedly breaching its contract with Plaintiff, Defendants improperly disguised and retained rebates, discounts, and kickbacks, and overcharged Plaintiff for the cost of prescription drugs. (*Id.* at ¶91.)

The Court agrees with Defendants in that Plaintiff alleges the same conduct by Defendants for both its breach of contract and unjust enrichment claims. (Doc. #57 at 9-10.) Plaintiff disputes this conclusion, arguing by example that while the contract required Defendants to manage the plan by setting up and maintaining a formulary, the contract did not require the formulary to include any particular drugs, or class of drugs. (Doc. #58 at 11.) Even if true, the Court is not in a position to re-write the parties' obligations to impose the specific requirement that Defendants "list the cheapest, or best, or most-effective drug for any given condition." (*Id.*) *See AdiPar Ltd. v. PLD Intern. Corp.*, No. 01 Civ. 0765, 2002 WL 31740622, at *11 -12 (D.N.Y. Dec. 6, 2002) (unjust enrichment may not be used to adjust the contract's terms *ex post*).

Plaintiff further claims that the contract does not contemplate Defendants' collusion with the pharmaceutical company, and its basis for claiming unjust enrichment is that such collusion

resulted in the publication of inflated drug prices. (Doc. #58 at 11-12.) The Court does not find this subject matter to be distinct from that covered in the contract, which requires Defendants to reimburse providers according to a set schedule and reconcile their reimbursements with the amounts charged to the plans.

Plaintiff alternatively asserts that in case some of the class members are not found to be party to, or beneficiaries under, the contract, they should be afforded a remedy in quasi contract. (Doc. #58 at 12.) The Court rejects this argument.

Plaintiff has brought this class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. (Doc. #55 at ¶77.) To be certified as a class, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Although this does not require every question to be common to every member, a plaintiff seeking certification under Rule 23(a) and (b)(3) must establish that (1) common questions "predominate over any questions affecting only individual members," and (2) "class resolution is superior to other available methods for the fair and efficient adjudication of the controversy." *Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005) (quoting Fed. R.Civ.P. 23(b)(3); *Amchem Products, Inc. v. Windsor*, 117 S.Ct. 2231, 2249-51 (1997)).

Plaintiff's current position contradicts its previous allegation that its breach of contract claim is based on "[t]he standardized contracts between Defendant and COBA, as well as other public employee organizations encompassing Class members..." (Doc. #55 at ¶90.) For this Court to inquire as to the rights of each class member, outside the parties' contract, would defeat the predominance and superiority requirements of Rule 23(b)(3), and render the class action form valueless. Therefore, if plaintiff wishes to proceed as a class in this action, the Court will refrain from conducting a series of mini-trials to determine both liability and damages for each individual member. *See*, *e.g.*, *Goodwin v. Conagra Poultry Co.*, No. 03-CV-1187, 2007 WL 1434905, at *16 (D.Ark. May 15, 2007) (Where defendants' liability to each individual, and amount of damages owed, will depend on each of the individuals' particular circumstances, and is subject to any defenses defendants may have, questions of law and fact common to the class are not predominate.); *accord Blades*, 400 F.3d at 568-71.

For the reasons stated above, the Court finds a valid contract defining the parties' respective rights and responsibilities, and covering the subject matter at issue. Therefore, any remedy in quasi contract is duplicative of Plaintiff's claim for breach of contract . *See Clark-*

*Fitzpatrick, Inc.*, 70 N.Y.2d at 388-89 ("[A] quasi-contractual obligation is one imposed by law where there has been no agreement or expression of assent, by word or act, on the part of either party involved.") (emphasis omitted).  Accordingly, Count IV is **HEREBY DISMISSED**.


### COUNT V:  CONVERSION

Defendants next move the Court to dismiss Plaintiff's conversion claim in that (i) it is duplicative of Plaintiff's breach of contract claim, and (ii) it does not sufficiently establish Plaintiff's ownership of the funds at issue, or that the funds were "specific and identifiable." (Doc. #57 at 11.)

Conversion is the unauthorized exercise of dominion or control over property, which interferes with the legal title or superior possessory right of another.  *Republic of Haiti v. Duvalier*, 211 A.D.2d 379, 384 (N.Y. App. Div. 1995); *Meese v. Miller*, 79 A.D.2d 237, 242 (N.Y. App. Div. 1981).  To state a claim for conversion, the plaintiff must establish (i) legal title or an immediate superior right to a specific identifiable thing, *Meese*, 79 A.D.2d at 242 (citing *AMF Inc. v. Algo Distributors, Ltd.*, 48 A.D.2d 352, 356 (N.Y. App. Div. 1975)); and (ii) an unauthorized exercise of dominion over that property, to the exclusion of plaintiff's rights. *Meese*, 79 A.D.2d at 242-43 (citing *AMF Inc.*, 48 A.D.2d at 356-57 *and Independence Discount Corp. v. Bressner*, 47 A.D.2d 756, 757 (N.Y. App. Div. 1975)).

In turning to Defendants' first argument, the Court agrees that " 'a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated ...' " *Spanierman Gallery, PSP v. Love*, 03 Civ. 3188, 2003 WL 22480055, at *3 (D.N.Y. Oct. 31, 2003) (quoting *Clark-Fitzpatrick*, 70 N.Y.2d at 388).  Therefore, where a plaintiff states a claim for breach of contract, a conversion claim will only be proper where the " 'legal duty ∴ spring[s] from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.' " *American Equities Group, Inc. v. Ahava Dairy Products Corp.*, No. 01 Civ. 5207, 2004 WL 870260, at *16 (D.N.Y. Apr. 23, 2004) (quoting *Spanierman*, at *3).  *See also Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F.Supp.2d 609, 618 (D.N.Y. 2003) (plaintiff must allege wrongdoing beyond that which breaches the contract).

Defendants argue that the conversion claim is duplicative of Plaintiff's breach of contract claim, wherein it is alleged that Defendants violated the parties' contract by secretly obtaining,

and retaining for their own benefit, rebates, discounts, and kickbacks. (*Id.* at ¶¶90-91.) While the Court acknowledges the similarity of these claims, the Court finds sufficient evidence of wrongful conduct beyond Defendants' breach (*supra* notes 2 & 3). *See Astroworks*, 257 F.Supp.2d at 618 (allegations of fraudulent misrepresentation and wrongful appropriation is misconduct beyond that which breached the contract and is sufficient to defeat a motion to dismiss).

Additionally, at this early stage, a plaintiff may properly assert alternative theories in its complaint[FN14] so long as each count contains all the necessary elements. *See Key Bank of New York v. Grossi*, 227 A.D.2d 841, 843-44 (N.Y. App. Div. 1996) (a claim for conversion is proper where defendant's conduct was an exercise of dominion over the property, in violation of plaintiff's rights, even where the violative conduct also breaches the parties' contract); *accord Meese*, 79 A.D.2d at 243-44. *But see, e.g., Citadel Management, Inc. v. Telesis Trust, Inc.*, 123 F.Supp.2d 133, 149-50 (D.N.Y. 2000) (conversion claim dismissed where plaintiff would be fully compensated for its loss if successful on its contract claim); *Global View Ltd. Venture Capital v. Great Central Basin Exploration, L.L.C.*, 288 F.Supp.2d 473, 479 (D.N.Y. 2003) (a court should not allow a conversion claim for the same money which represents money damages in an action for breach of contract) (citing *Fraser v. Doubleday & Co.*, 587 F.Supp. 1284, 1288 (D.N.Y. 1984)).

> **FN14**. A party may properly set forth alternative theories of recovery based on the same set of facts, *Baucom v. DePaul Health Center*, 918 F.Supp. 288, 292 (D.Mo. 1996) (citing FED. R. CIV. P. 8(e)); so long as proper instructions are given to the jury to prevent double recovery.

Defendants next argue that Plaintiff failed to allege (i) that it had ownership of the funds at issue, or (ii) that the funds were a specific, identifiable chattel. (Doc. #57 at 12.) As there are three classes of funds to which Plaintiff stakes its claim for conversion, the Court finds it useful to address each in turn.

### i.  REBATES

The Court finds that Plaintiff has sufficiently established its ownership of the rebates, and that such amounts were specific and identifiable.

First, for purposes of a motion to dismiss, the Court is satisfied with Plaintiff's showing that it had ownership over the rebates at issue. *See Citadel*, 123 F.Supp.2d at 147 (plaintiff must

demonstrate his "ownership, possession or control of the money before its conversion") (quoting *ESI, Inc. v. Coastal Power Production Company*, 995 F.Supp. 419, 433 (D.N.Y. 1998)). Plaintiff's complaint alleges that Defendants were required to negotiate and obtain rebates from pharmaceutical manufacturers and pass a portion of such amounts to Plaintiff (*supra* note 2 at ¶2). The parties' contract supports this alleged obligation by requiring Defendants to distribute to Plaintiff a set percentage of the net manufacturers' rebate received (*id*). Taking Plaintiff's allegations as true, and in light of the parties' contract, the Court finds sufficient evidence of Plaintiff's ownership claim to the rebates.

Next, the Plaintiff has properly alleged the "specific and identifiable" requirement with respect to some rebate amounts. *See Fiorenti v. Central Emergency Physicians, PLLC.*, 305 A.D.2d 453, 454-55 (N.Y. App. Div. 2003) (citing *Independence Discount*, 47 A.D.2d at 757). Courts have long recognized money as the proper subject of a conversion action so long as it is "described, identified, or segregated in the manner that a specific chattel can be and when it is subject to an obligation to be returned." *Hebrew Institute for the Deaf and Exceptional Children v. Kahana*, No. 27823-06, 2007 WL 2937166, at *3 (N.Y. Sup. Ct. Oct. 9, 2007).

*See*, *e.g.*, *Citadel*, 123 F.Supp.2d at 149 (Funds deposited in a general bank account are not specific and identifiable unless held in a distinct separate account, because general deposits become the bank's property and available for its business use.); *accord Independence Discount*, 47 A.D.2d at 757 (funds were not specific where defendant was required to pay "amounts due" from any fund). *But see Payne v. White*, 101 A.D.2d 975, 976 (N.Y. App. Div. 1984) (funds of specific named bank account are sufficiently identifiable); *accord Lenczycki v.Shearson Lehman Hutton, Inc.*, 238 A.D.2d 248 (N.Y. App. Div. 1997). *See also*, *e.g.*, *Manufacturers Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113, 125 (N.Y. App. Div. 1990) (wire transfer of specific sum to be transferred or returned was specifically identifiable); *Key Bank*, 227 A.D.2d at 843 (auction sale proceeds were sufficiently identifiable); *Woodie v. Azteca Intern. Corp.*, No. 603582/04, 2005 WL 2171181, at *5 (N.Y. Sup. Ct. July 1, 2005) (specified amount of personal funds spent on business expenses were specifically identifiable). *C.f. Heffernan v. Marine Midland Bank, N.A.*, 267 A.D.2d 83, 84 (N.Y. App. Div. 1999) (conversion claim was proper where deposits were allegedly misappropriated from trust account to fiduciary's personal accounts).

Plaintiff alleges that Defendants were contractually required to keep records of all its transactions with the pharmaceutical manufacturers, and the parties' contract supports the existence of this obligation (*supra* note 2 at ¶2). Therefore, it is alleged that once the pharmaceutical manufacturers paid rebates, Defendants were obligated to pay over, upon demand by Plaintiff, a portion of the specific proceeds derived. *See AMF, Inc.*, 48 A.D.2d at 357 (Plaintiff had an immediate right to the possession of specific money where the agreement required defendant to "account to ∴ [plaintiff] for the proceeds of any goods upon request."). Accordingly, with respect to those rebates; to which the Plaintiff is entitled by virtue of the parties' contract, and which were required to be deposited in Plaintiff's funds on deposit; the Court finds these amounts specific and identifiable for purposes of a motion to dismiss.

## DISCOUNTS

Turning to the discounts, the Court finds that Plaintiff has failed to establish that such amounts are specific and identifiable.

The common law action of conversion "has always centered exclusively on the physical theft of specific, identifiable, corporeal, tangible, personal property, in its most rudimentary sense." *Shmueli v. Corcoran Group*, 9 Misc.3d 589, 591 (N.Y. Sup. Ct. 2005)(citing *Comprehensive Community Dev. Corp. v. Lehach*, 223 A.D.2d 399 (N.Y. App. Div. 1996) (copies of medical files); *Warner v. Village of Chatham*, 194 A.D.2d 980, 981 (N.Y. App. Div. 1993) (automobiles); *Manufacturers Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113, 113-14 (App. Div. 1990) (specifically identifiable, segregated, funds); *Wallingford v. Kaiser*, 110 A.D. 503, 505-06 (N.Y. App. Div. 1906) (animals)).

Plaintiff alleges that Defendants were obligated to negotiate and obtain discounts from pharmaceutical retailers and pass those savings along to the plans (*supra* note 2 at ¶3). However, it is alleged that Defendants wrongfully diverted and retained a portion of undisclosed and/or misappropriated discounts for their own benefit (*id*).

Here, Plaintiff has not alleged a specific amount over which it has a claim, where such an amount has been kept or segregated in some way, when such an amount became due, or how such an amount may ever become discernible. Therefore, the Court finds that, even assuming *aguendo* that Plaintiff has a superior possessory right over the discounts at issue, such amounts are not specific and identifiable. Accordingly, the amount of monies attributed to retail pharmacy

discounts are not subject to Plaintiff's conversion claim. *See Global View*, 288 F.Supp.2d at 479-80 (Conversion claim must be dismissed where the complaint merely refers to unspecified monies in an amount in excess of $75,000, "there is no indication of an identifiable fund or otherwise segregated amount, nor is there any description of the alleged transfer or transfers from which the Court could infer a specifically identified fund of money.").

## KICKBACKS

Lastly, the Court finds that Plaintiff has not sufficiently established its ownership or superior possessory rights over the alleged kickbacks. *See Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88 A.D.2d 883, 884 (where plaintiff never had ownership, possession or control of the commissions, conversion claim was dismissed).

It is alleged that Defendants wrongfully obtained and retained undisclosed kickbacks from pharmaceutical manufacturers in return for "switching" drugs on their formulary, and "steering" plan members away from generics (*supra* note 2 at ¶¶3 & 5). Even assuming such amounts were received by Defendants, Plaintiff has not established that it ever had title to, or possession or control of, the funds alleged to have been converted. Therefore, such amounts shall not be the subject of Plaintiff's conversion claim. *See Fiorenti*, 305 A.D.2d at 455.

Accordingly, Defendants' motion to dismiss Plaintiff's conversion claim is **HEREBY GRANTED IN PART**. Plaintiff's conversion claim may go forward only with respect to those rebates to which Plaintiff is entitled by virtue of the parties' contract, and which were required to be deposited in Plaintiff's funds on deposit with Defendants. In all other respects, Defendants' motion to dismiss Plaintiff's conversion claim is granted.

## COUNT VI: BREACH OF THE IMPLIED COVENANT

In their last argument, Defendants move the Court to dismiss Plaintiff's claim for breach of the implied covenant of good faith and fair dealing ("implied covenant"), in that it is duplicative of Plaintiff's claim for breach of contract.

The court in *JewelAmerica Inc. v. Frontstep Solutions Group, Inc.*, No. 02 Civ. 1328, 2002 WL 31465807, at *1 (D.N.Y. Nov. 1, 2002), dismissed plaintiff's claim for breach of the implied covenant because plaintiff had alleged the same conduct in its claim for breach of contract (citing *In re Houbigant, Inc.,* 914 F.Supp. 964, 989 (D.N.Y. 1995) (violation of implied

covenant was predicate for claim for breach of express contract provision) *and Sauer v. Xerox Corp.,* 95 F.Supp.2d 125, 132 (D.N.Y. 2000) (suggesting claim for implied covenant is only proper " ' where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain.' ")).

For purposes of a motion to dismiss, Plaintiff's complaint properly states that (i) Defendants owed a duty to refrain from committing those acts which would improperly deprive Plaintiff of the benefit of its bargain (*id.* at ¶108), *see Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389 (N.Y. 1995) (implied duty of good faith and fair dealing promises that neither party to a contract will do those things having the effect to destroy or injure the rights of the other to receive the benefit of his bargain) (citing *Kirke La Shelle Co. v. Armstrong Co.,* 263 N.Y. 79, 87 (N.Y. 1933)); and (ii) that the preceding acts described in the complaint[FN15] establish a miscarriage of that duty (Doc. #55 at ¶109).

> **FN15**. Each count in the complaint incorporates by reference all the facts alleged in the preceding paragraphs. (Doc. #55 at ¶107.)

Here, the parties' contract provides that (I) "[Defendants are] engaged in the business of administering prescription drug plans for [Plaintiff] though a network of Participating Providers" (Contract at 1); and (II) Defendants are responsible to (i) solicit providers (*id.* at 4 §C), (ii) reimburse providers according to a set fee schedule (*id.* at 15-16), (iii) select formulary drugs and establish prices based on the "Drug Topics RedBook" updated weekly to determine the maximum allowable drug ingredient cost (*id.* at 4 §J), (iv) provide reports to Plaintiff and participating providers (*id.* at 4§L, 6§A, 7 ¶2 & 17 §4), and (v) distribute to Plaintiff a set portion of net rebates (*id.* at 17). However, the contract does not speak to Defendants' alleged obligations to obtain rebates and discounts on behalf of the health plans, or to pass on such amounts in the forms of "lower drug benefit costs, lower co-payments and lower insurance premiums." (Doc. #55 at ¶15.)

Once again, the Court notes the propriety of a plaintiff's right to assert alternative theories of relief (*supra* note 14). Here, the parties' contract does not expressly deal with each of the allegations contained in Plaintiff's complaint; therefore a claim for breach of contract may not afford Plaintiff all the relief to which it is entitled. Conversely, the implied covenant operates to insert into a contract those " 'promises which a reasonable person in the position of the promisee would be justified in understanding were included.' " *Rowe v. Great Atlantic & Pac. Tea Co.,*

*Inc.*, 46 N.Y.2d 62, 69 (N.Y. 1978) (quoting 5 SAMUEL WILLISTON, THE LAW OF CONTRACTS § 1293: 3682 (rev. ed. 1937)). The party asserting the implied covenant bears a heavy burden to prove "not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole." *Rowe*, 46 N.Y.2d at 69.

The Court finds it reasonable for Plaintiff to enter into a contract with, and pay for the services of, a PBM; and expect the PBM not to appropriate undisclosed, additional amounts for its own benefit in the form of rebates, discounts, or kickbacks. Additionally, while the parties' contract does not address kickbacks, the Court finds it reasonable for a party contracting with a PBM, for the purpose of lowering its drug costs, to expect the PBM not to enter into secret negotiations with providers, and extract and retain undisclosed amounts, all the while increasing drug costs to the party- health plan it administers. *See RUS, Inc. v. Bay Indus., Inc.*, 322 F.Supp.2d 302, 315 (D.N.Y. 2003) ("To breach the implied covenant, the party must act in a way that is inconsistent with the justified expectations of the other party, or act for reasons other than the ones it discloses.").

Therefore, the Court finds that Plaintiff has sufficiently stated a cause of action for Defendants' alleged breach of the implied covenant, in that it sufficiently alleges facts which show that Defendants' conduct sought to withhold Plaintiff's benefits under the contract. *See Dweck Law Firm, L.L.P. v. Mann*, 340 F.Supp.2d 353, 358 (D.N.Y. 2004) (citing *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 265 A.D.2d 513, 514 (N.Y. App. Div. 1999)). Accordingly, Defendants' motion to dismiss Count VI is **HEREBY DENIED**.

## CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss (Doc. #56) is **HEREBY GRANTED IN PART** and **DENIED IN PART**.

**A**s to <u>Count I</u>: Violation of Section 349 of New York's General Business Law, Defendants' motion to dismiss is **HEREBY GRANTED IN PART**. The Court *limits* the relief available to Plaintiff, as it relates to this claim, to *actual damages*.

**A**s to <u>Count III</u>: Breach of Fiduciary Duty, Defendants' motion to dismiss is **HEREBY DENIED**.

**A**s to <u>Count IV</u>: Unjust Enrichment, Defendants' motion to dismiss is **HEREBY GRANTED**.

**A**s to Count V: Conversion, Defendants' motion to dismiss is **HEREBY GRANTED IN PART**. The Court *limits* the scope of Plaintiff's conversion claim to the ***rebates*** covered under the parties' contract.

**A**s to Count VI: Breach of the Covenant of Good Faith and Fair Dealing, Defendants' motion is **HEREBY DENIED**.

**D**ated this 31st Day of October, 2007.

_____

SENIOR UNITED STATES DISTRICT JUDGE