SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ALBANY
-----------------------------------------------------------------
PEOPLE OF THE STATE OF NEW YORK, by
ELIOT SPITZER, Attorney General of the State of
New York, NEW YORK STATE DEPARTMENT
OF CIVIL SERVICE, and STATE OF NEW YORK,

                              Plaintiffs,                            **COMPLAINT**

            -- against --                                             Index No.  4669-04

EXPRESS SCRIPTS, INC., ESI MAIL
PHARMACY SERVICE, INC., CONNECTICUT
GENERAL LIFE INSURANCE COMPANY,
and CIGNA LIFE INSURANCE COMPANY
OF NEW YORK,

                              Defendants.
-----------------------------------------------------------------

TO:    THE SUPREME COURT OF THE STATE OF NEW YORK

        The People of the State of New York, by their attorney, Eliot Spitzer, Attorney General of

the State of New York, the New York State Department of Civil Service, and the State of New

York, allege the following upon information and belief:

                        **PRELIMINARY STATEMENT**

        1.       Plaintiffs bring this action seeking injunctive relief, restitution, damages,

indemnification and civil penalties resulting from defendants' breaches of contract, and for

Express Scripts Inc. ("ESI")'s fraudulent, deceptive and illegal schemes to (a) conceal and retain

millions of dollars in rebates and other payments from pharmaceutical manufacturers that belong

to New York State's principal employee health plan, the Empire Plan, (b) enrich itself at the

expense of the Empire Plan and its members by artificially inflating prices of prescription drugs,

and (c) operate drug preference programs, including "switching" programs, that enrich ESI but

EXHIBIT

5

often result in higher drug costs for the Empire Plan and other government employee benefit plans and their members, while failing to take into account patient health and safety.

## INTRODUCTION

2.      Defendant ESI is a pharmacy benefit manager ("PBM"). ESI contracts with health plans to administer the plans' prescription drug benefit programs. Pursuant to these contracts, health plans pay ESI, typically on a per claim basis, to process their members' prescriptions through a network of retail and mail order pharmacies established by ESI. ESI also sells prescription drugs directly through its own mail order pharmacies, including defendant ESI Mail Pharmacy Service, Inc., which operates a pharmacy in Troy, New York.

3.      ESI is the third-largest PBM in North America. ESI provides pharmacy benefit services for approximately 52 million people in approximately 19,000 client groups that include health maintenance organizations, health insurers, third-party administrators and government health programs. From 1998 to 2003, ESI's revenues from its PBM services were in excess of $46 billion.

4.      ESI promotes its services by promising to save health plans and their members large sums of money on their prescription drug costs. ESI represents that it can achieve these savings by (1) using its bulk purchasing power on behalf of a health plan to (a) negotiate lower prices from pharmacies that dispense drugs to plan members, and (b) obtain rebates for the plan from drug manufacturers, and (2) maximizing a plan's use of cheaper generic drugs.

5.      Among ESI's marketing representations made to current and prospective client health plans are the following:

2

- "We pledge to . . . [a]lways align our interests with those of our clients and their members."

- "We believe partnering -- moving together toward mutually aligned objectives -- is the foundation of every client relationship."

- "[O]ur unwavering commitment to serve our clients to the best of our collective abilities, with their interests as our only agenda."

- "We will place nothing higher than your interests.  We will . . . serve as your partner . . . ."

6.      The New York State Department of Civil Service administers the New York State Health Insurance Program ("NYSHIP").  NYSHIP offers several health and drug benefit plans that provide medical and drug coverage for active and retired State and local government employees and their dependents.  The Empire Plan is the largest of the health and drug benefit plans maintained and administered by the Department of Civil Service and provides coverage for more than one million active and retired State and local government employees and their dependents.  As a governmental health and drug benefit plan, the Empire Plan is not subject to the federal Employee Retirement Income Security Act of 1974 ("ERISA") (29 USC § 1001, et seq.).  Pursuant to Civil Service Law § 162, the President of the Civil Service Commission, who also is the Commissioner of the Department of Civil Service, is authorized to purchase health benefits, including drug benefits, for State employees on behalf of the State through a licensed insurer.  The President of the Civil Service Commission and the Department of Civil Service are hereinafter collectively referred to as "DCS."

7.      In January 1998, the State of New York, through DCS, entered into a contract with defendant Connecticut General Life Insurance Company ("CGL"), a licensed insurer, to provide and insure the Empire Plan's prescription drug program for the calendar year 1998.  CGL

3

subcontracted with ValueRx Pharmacy Program, Inc. ("ValueRx") to administer the Empire Plan's prescription drug program. In April 1998, ESI acquired ValueRx.

8.       In December 1998, DCS entered into a contract with CGL to provide the Empire Plan's prescription drug program from January 1, 1999, through December 31, 2003. CGL subcontracted with ESI to administer the Empire Plan's prescription drug program.

9.       DCS was induced to enter into the 1999-2003 contract by material misrepresentations regarding the discounts ESI was obtaining from pharmacies for prescription drugs on behalf of the Empire Plan.

10.      During the six contract years (1998 and 1999-2003), the Empire Plan paid ESI and CGL fees and other charges of approximately $50.5 million to administer the Plan's prescription drug program.

11.      In the course of administering the Empire Plan's prescription drug program, ESI devised and carried out several schemes to defraud the Empire Plan out of tens of millions of dollars.

Disguising and Retaining Manufacturer Rebates

12.      In breach of the 1998 and 1999-2003 contracts and subcontracts, and pursuant to a fraudulent and deceptive scheme to disguise drug manufacturer rebate payments, ESI retained for itself millions of dollars in manufacturer rebates and other payments that ESI was obligated to pay to the Empire Plan.

Unauthorized and Improper Sale of Empire Plan Data

13.      In breach of the 1999-2003 contract, ESI generated substantial sums of money for itself by selling, licensing, otherwise using or releasing data belonging to the Empire Plan to drug

4

manufacturers and data collection services for marketing purposes without DCS's authorization.

<u>Pricing Schemes</u>

14.    In 1999, the Empire Plan spent $455 million on prescription drug claims for plan members. By 2003, the cost to the Empire Plan of prescription drug claims for plan members had grown to more than $1 billion. Over the course of the 1999-2003 contract, the average annual cost of prescription drug claims to the Empire Plan exceeded $720 million.

15.    In the course of the 1999-2003 contract and subcontract, ESI developed and carried out drug pricing schemes through which it enriched itself by millions of dollars at the expense of the Empire Plan and its members.

16.    Pursuant to the 1999-2003 contract and subcontract, ESI was responsible for negotiating prices for drugs on behalf of the Empire Plan with participating retail pharmacies in the ESI network at which members could have their prescriptions filled. ESI represented and promised that it would, on the Empire Plan's behalf, "negotiat[e] [with pharmacies] pricing arrangements that utilize the [Empire Plan's] size to optimize [drug] cost discounts." ESI also represented that it would obtain drugs for the Empire Plan "at the best time and at the best price" based on "market variables" and "real pharmacy acquisition costs."

17.    For prescriptions filled at in-state pharmacies, the 1999-2003 contract provided that the amount charged to the Empire Plan for a drug would be the same amount paid by ESI to the pharmacy. Under this method, known as "pass through" pricing, ESI is paid a fixed fee for processing each prescription and cannot make a profit on what it charges a plan for the drug.

18.    ESI uses a different pricing method with many health plans known as "spread" pricing. Under this method, the plan negotiates a guaranteed price for drugs with ESI. If ESI can

negotiate a lower price with the pharmacy, ESI retains as profit the difference or "spread" between what it pays the retail pharmacy for the drug and what it charges the plan.

19.     In breach of the 1999-2003 contract and subcontract, and pursuant to a fraudulent and deceptive scheme, ESI did not use the Empire Plan's bargaining power to obtain the best price for drugs based on real pharmacy acquisition costs. Instead, ESI paid certain in-state retail pharmacy chains inflated prices for generic drugs for Empire Plan members, and then passed through these inflated prices to the Empire Plan.

20.     Because ESI paid these same pharmacy chains inflated prices for the Empire Plan and other "pass through" plans, the pharmacy chains accepted lower prices from ESI for the same drugs dispensed to the members of ESI's "spread" plans. This scheme generated huge profits for ESI when it charged "spread" plans higher rates than it paid the pharmacies.

21.     ESI also established several schemes that denied DCS the benefit of generic substitution for brand name drugs and resulted in increased costs for the Empire Plan and its members, while significantly increasing profits for ESI.

Fraud and Deception in ESI's Drug "Switching" Programs

22.     ESI operates programs to increase usage of a particular manufacturer's drugs, and thus obtain rebates and other payments from the manufacturer that ESI often retains for itself.

23.     ESI induces physicians to switch a patient's medication by misrepresenting to the physician that the switch will reduce costs and promote quality of care. ESI conceals from patients, physicians and plans that many switches involve additional costs, including tests and doctor visits needed to monitor the new drug, and at times adversely affect patient health.

6

## **PARTIES**

24.     Plaintiffs are the People of the State of New York, by their attorney, Eliot Spitzer, Attorney General of the State of New York.  The Attorney General maintains offices at The Capitol, Albany, New York.

25.     Plaintiff State of New York (the "State") is the sovereign State of New York with its principal offices at The Capitol, Albany, New York.

26.     Plaintiff New York State Department of Civil Service is an agency of the State of New York with its principal offices at Building One, State Campus, Albany, New York.

27.     Plaintiffs commence this action pursuant to: (1) Executive Law § 63(1), under which the Attorney General is empowered to prosecute and defend all actions and proceedings in which the State of New York is interested; (2) Executive Law § 63(12), under which the People of the State of New York, by the Attorney General of the State of New York, are empowered to seek injunctive relief, restitution, damages and costs against any person or business entity that has engaged in repeated fraudulent or illegal acts or otherwise engaged in persistent fraud or illegality in the conduct of a business; and (3) General Business Law ("GBL") Article 22-A, under which the People of the State of New York, by the Attorney General of the State of New York, are authorized to seek injunctive relief, restitution and civil penalties against any person or business entity which has engaged in deceptive acts or practices or false advertising in the conduct of business.

28.     Defendant ESI is a Delaware corporation with its principal place of business located at 13900 Riverpoint Drive, Maryland Heights, Missouri.

7

29.     On or about April 1, 1998, ESI acquired ValueRx. ESI is the successor-in-interest to ValueRx and assumed all past, present and future liabilities of ValueRx under all subcontracts between CGL and ValueRx entered into pursuant to agreements between DCS and CGL. Unless otherwise indicated, "ESI" hereafter refers to ValueRx and ESI.

30.     Defendant ESI Mail Pharmacy Service, Inc. ("ESI Mail") is a Delaware corporation with its principal place of business located at 13900 Riverpoint Drive, Maryland Heights, Missouri. ESI Mail is a subsidiary of ESI. ESI Mail, individually and through its pharmacists, is engaged in the practice of pharmacy and is licensed as a pharmacy under the laws of New York. ESI Mail employs licensed pharmacists and other personnel at its pharmacies, including one located in Troy, New York, who perform or assist in performing professional pharmacy services.

31.     Defendant CGL is a Connecticut corporation, with its principal office located at 900 Cottage Grove Road, Bloomfield, Connecticut.

32.     Defendant CIGNA Life Insurance Company of New York ("CLIC") is a New York corporation with its principal office located at Two Liberty Place, TL18A, 1601 Chestnut Street, Philadelphia, Pennsylvania. CLIC was incorporated as a stock life insurance company under the laws of New York in June 1965 under the name "INA Life Insurance Company of New York" ("INA"). INA changed its name to "CIGNA Life Insurance Company of New York" in July 1999. Unless otherwise indicated, "CLIC" hereafter refers to INA and CLIC.

33.     CGL and CLIC are members of the CIGNA network of companies, which collected over $15.7 billion in premiums and fees nationally in 2002.

8

34.     Plaintiffs have sent pre-litigation notices to defendants pursuant to GBL §§ 349(c) and 350-c.

## FACTS

### Defendants' Contracts with the State of New York

a.     **The 1994 and 1997 Contracts**

35.     In March 1994, DCS entered into a written contract with CGL, pursuant to which CGL agreed to provide PBM services for the Empire Plan for calendar years 1994-1996 ("1994 Contract").

36.     Pursuant to the 1994 Contract, CGL caused the Equitable Life Assurance Society of the United States ("Equitable") to issue an annually renewable group insurance policy to the State for calendar year 1994.  Equitable renewed the policy for calendar year 1995.  CGL itself issued the group insurance policy for calendar year 1996.

37.     CGL and ValueRx thereafter entered into a series of subcontracts pursuant to which ValueRx assumed responsibility for administering the PBM services that CGL agreed to provide to the Empire Plan under the 1994 Contract.

38.     DCS and the State performed all of their obligations under the 1994 Contract and the 1994, 1995 and 1996 policies, including paying all insurance premiums and other fees required by the 1994 Contract and the 1994, 1995 and 1996 policies.

39.     In December 1996, CGL and DCS entered into a one-year extension of the 1994 Contract to provide PBM services to the Empire Plan for calendar year 1997 ("1997 Contract").

40.     Pursuant to the 1997 Contract, CGL issued a renewable group insurance policy to the State for calendar year 1997 ("1997 Policy").

9

41.     CGL and ValueRx thereafter entered into another subcontract pursuant to which ValueRx assumed responsibility for administering the PBM services that CGL agreed to provide to the Empire Plan.

42.     DCS and the State performed all of their obligations under the 1997 Contract and 1997 Policy, including paying all insurance premiums and other fees required by the 1997 Contract and 1997 Policy.

**b.     The 1998 Contract**

43.     In January 1998, DCS entered into a one-year contract with CGL, pursuant to which CGL agreed to continue to provide PBM services to the Empire Plan through December 31, 1998 ("1998 Contract").

44.     Pursuant to the 1998 Contract, CGL caused its affiliate CLIC to issue a group insurance policy to the State covering calendar year 1998 ("1998 Policy").

45.     The 1998 Contract allowed CGL to subcontract certain portions to "qualified organizations," but expressly stated that CGL "retains the ultimate responsibility for all services performed" under the Contract.

46.     CGL and ValueRx thereafter extended their subcontract to cover calendar year 1998 ("1998 Subcontract").  ESI acquired ValueRx in or about April 1998.

47.     DCS and the State are intended third-party beneficiaries of the 1998 Subcontract. ESI's performance under the 1998 Subcontract runs directly to DCS and the State, and CGL and ESI intended that ESI's performance under the 1998 Subcontract directly benefit DCS and the State.

10

48.     The 1998 Contract provided that CGL would indemnify and hold harmless DCS and the State from any and all claims or losses caused by CGL or any and all subcontractors. Specifically, the 1998 Contract provides:

> [CGL] . . . shall hold harmless and indemnify the State and [DCS], their officers and employees from and against any injury, damage, loss or liability to persons or property resulting from or arising out of (a) this Agreement and (b) the acts, omissions, liabilities or obligations of [CGL], any affiliate, or any person or entity engaged by [CGL] as an expert, consultant, independent contractor, subcontractor, employee or agent.

49.     The 1998 Policy issued by CLIC similarly provides:

> [CLIC] . . . shall hold harmless and indemnify the State and [DCS], their officers and employees from and against any injury, damage, loss or liability to persons or property resulting from or arising out of (a) this Agreement and (b) the acts, omissions, liabilities or obligations of [CLIC], any affiliate, or any person or entity engaged by [CLIC] as an expert, consultant, independent contractor, subcontractor, employee or agent.

50.     DCS and the State performed all of their obligations under the 1998 Contract and 1998 Policy, including paying all insurance premiums and other fees required by the 1998 Contract and 1998 Policy.

**c.     The 1999 Contract**

51.     In December 1998, DCS entered into a contract with CGL pursuant to which CGL agreed to provide PBM services to the Empire Plan from January 1, 1999, through December 31, 2003 (the "1999 Contract").

52.     The 1999 Contract allowed CGL to subcontract certain portions to "a qualified organization," but expressly stated that CGL "retains the ultimate responsibility for all services performed" under the Contract.

11

53.     The 1999 Contract was preceded by a formal bid process and request for proposals ("RFP"). CGL and ESI (as CGL's then-existing and proposed subcontractor), presented a formal response to the RFP and thereafter made numerous statements and representations to DCS in the course of written and verbal communications to DCS and others, including in response to specific questions from DCS and others, concerning such matters as pharmacy network discounts and rebate savings.

54.     The representations made by CGL and ESI in the response to the RFP and in the other communications were made for the purpose of inducing DCS and other New York State agencies and officials to cause DCS to enter into the 1999 Contract with CGL and approve ESI as the subcontractor under the Contract.

55.     The RFP, the response by CGL and ESI, follow-up questions from DCS and others and CGL's and ESI's responses (collectively "1998 Proposal") were incorporated into and made a part of the 1999 Contract.

56.     ESI and CGL represented in the 1998 Proposal that DCS and the State had placed trust in ESI and CGL by retaining them, both previously and at that time, to manage the pharmacy benefit component of the Empire Plan, repeatedly referring to the State as ESI's and CGL's "client," and noting that ESI and CGL had been "a proven advisor" to the State. ESI and CGL emphasized in the 1998 Proposal that they were "well positioned to serve as the consultant that delivers . . . advice and makes sound recommendations on how to proceed. We have the key ingredient of trust firmly established."

57.     ESI and CGL also touted their expertise in the 1998 Proposal, stating that "we see ourselves as medical management experts," and that ESI and CGL "combin[e] expertise drawn

from experience with past implementations and the technical knowledge of internal experts . . . ." ESI and CGL further represented that they had "acquired a specialized set of skills: managing pharmaceutical use, understanding the complexity of health care benefits, understanding diseases, applying information technology to information management and communication with payors, their members, pharmacy providers, doctors and pharmaceutical manufacturers."

58.     ESI and CGL in fact held unique and special experience in providing PBM services, and DCS and the State placed their trust and confidence in CGL and ESI with respect to the PBM services that ESI and CGL had been providing to DCS, and would continue to provide under the 1999 Contract.

59.     The 1999 Contract stated that DCS was engaging CGL to provide the services and accomplish the objectives of the Contract "in reliance upon" CGL's "expertise."

60.     Pursuant to the 1999 Contract, CGL was required to cause its affiliate, defendant CLIC, to issue a group insurance policy to the State for the term of the 1999 Contract. CGL was further required to reinsure such policy during the term of the contract, and DCS was required to make all premium payments and other fees due under the policy to CGL.

61.     Under the terms of the 1999 Contract, the pharmacy benefit insurance program administered by CGL was experience rated and fully participating, and any annual losses suffered by CGL were recoverable from DCS in the subsequent year (except losses suffered in the final year of the contract, which CIGNA would write off). CIGNA has recovered losses from DCS, and has not had to write-off any losses incurred under its contracts with DCS.

13

62.    Although ESI, CGL, DCS and the State conducted themselves as if an insurance policy had been issued, it appears that no written insurance policy was issued by CLIC as required by the 1999 Contract.

63.    CGL entered into a series of written agreements with ESI (collectively "1999 Subcontract"), pursuant to which ESI assumed responsibility for administering the PBM services required by the 1999 Contract.

64.    DCS and the State were intended third-party beneficiaries of the 1999 Subcontract. As under the 1998 Subcontract, ESI's performance under the 1999 Subcontract ran directly to DCS and the State, and CGL and ESI intended that ESI's performance under the 1999 Subcontract directly benefit DCS and the State.

65.    The 1999 Contract provided that CGL would indemnify and save harmless DCS and the State from any and all claims or losses caused by CGL or any and all subcontractors. Specifically, the 1999 Contract provided:

> [CGL] agrees to indemnify, defend and save harmless the DCS and the State, its officers, agents, and employees from any and all claims or losses caused by the acts or omissions of [CGL] . . . the Insurer or of any and all subcontractors . . . furnishing or supplying work, services, materials, or supplies in connection with the performance of the Agreement and from all claims and losses accruing or resulting to any person, firm or corporation who may be injured or damaged by the Insurer in the performance of the Agreement, and against any liability, including, but not limited to, costs and expenses, for violation of proprietary rights, copyrights, patents, or rights of privacy, arising out of the publication, translation, reproduction, delivery,  performance, use, or disposition of any material, information or data furnished under the Agreement . . . .

14

66.     The 1999 Contract also provided that CGL "shall also provide indemnification against all losses, and/or cost expenses (including reasonable counsel fees) that may be incurred by reason of the [CGL's] breach of any term, provision, covenant, warranty, or representation contained herein and/or in connection with the enforcement of the [1999 Contract] or any provision hereof."

67.     DCS and the State performed all of their obligations under the 1999 Contract, including paying all insurance premiums and other fees required under the Contract.

**ESI and CGL's Misrepresentations in the**
**Course of the 1999 Contract Negotiations**

68.     In the course of the 1999 Contract negotiations, ESI and CGL made material misrepresentations regarding the discounts DCS was then receiving for both brand and generic drugs from pharmacies in the Empire Plan's in-state network in order to induce DCS to enter into the 1999 Contract and approve ESI as subcontractor.

**a.     Brand Discounts**

69.     In the RFP, DCS requested bidders to "describe in detail the proposed Pharmacy Reimbursement Formula used to compute your premium rate." In response to this request and as part of the 1998 Proposal, ESI and CGL represented to DCS that, as of the date they submitted their response to the RFP, the average effective discount DCS was receiving for brand drugs dispensed by pharmacies in the Empire Plan's in-state network was 20% off average wholesale price ("AWP"), or AWP -20%.

70.     ESI knew at the time it and CGL submitted their response to the RFP that this representation was false and that ESI's average effective discount with pharmacies in the in-state

15

Empire Plan network was <u>not</u> AWP -20% for brand drugs. In fact, ESI knew that the average effective discount rate with pharmacies in the in-state Empire Plan network as of the date of the 1998 Proposal was approximately AWP -15.42% for brand drugs.

71.     CGL lacked a reasonable basis to know whether the representations made in the response to the RFP regarding the average effective brand drug discount rate with pharmacies in the in-state Empire Plan network were true or false, and was negligent, careless and reckless in making the representations.

72.     DCS reasonably relied on ESI and CGL's material misrepresentations about brand drug discounts in awarding the 1999 Contract to ESI and CGL. DCS had no independent means to verify the discount rates that ESI and CGL represented. Reports that ESI submitted to DCS purporting to reflect 1997 and 1998 experience showed brand discounts to be approximately AWP -20%. Those reports, DCS later discovered, were false.

**b.     Generic Discounts**

73.     In the RFP, DCS requested bidders to "describe in detail the proposed Pharmacy Reimbursement Formula used to compute your premium rate." In response to this request and as part of the 1998 Proposal, ESI and CGL represented to DCS that, as of the date they submitted their response to the RFP, the average effective discount for all generic drugs was AWP -68% for the in-state Empire Plan network.

74.     ESI knew that at the time it and CGL submitted their response to the RFP, DCS was not receiving a discount of AWP -68% on generic drugs for the in-state Empire Plan network. Less than one month before submitting the response, ESI had calculated the in-state network's effective discount for generic drugs to be approximately AWP -60%.

16

75.     Furthermore, at the time ESI and CGL submitted their response to the RFP, ESI knew that the data it used to support their response were obsolete. Just that month (May 1998), ESI renegotiated less favorable discount rates with CVS, the largest single pharmacy chain in the Empire Plan's in-state network. The new discount pricing rate with CVS was AWP -53%, a rate approximately 20% below the previous rate applicable to CVS. ESI failed to inform DCS of its renegotiation of the CVS contract.

76.     CGL lacked a reasonable basis to know whether the representations made in the response to the RFP regarding the average effective generic drug discount rate with pharmacies in the in-state Empire Plan network were true or false, and was negligent, careless and reckless in making the representations.

77.     DCS reasonably relied on ESI and CGL's material misrepresentations in awarding the contract to ESI and CGL. DCS had no independent means to verify the discount rates that ESI and CGL represented. Reports that ESI submitted to DCS purporting to reflect 1997 and 1998 experience showed generic discounts to be approximately AWP -68%. Those reports, DCS later discovered, were false.

78.     ESI and CGL's misrepresentations of the average brand and generic discounts for the Empire Plan were material because the pharmacy reimbursement formulas of the RFP bidders were an important factor in comparing the bids and calculating the projected costs to the Empire Plan. A difference of a few percentage points in the pharmacy reimbursement rate represented millions of dollars in potential savings. As such, the pharmacy reimbursement formulas represented by ESI and CGL materially affected DCS's decision to award the 1999 Contract to CGL and ESI.

17

79.     As a result of ESI and CGL's misrepresentations about brand and generic drug discounts, DCS was injured because (a) it contracted with ESI and CGL instead of competitors, and (b) it overpaid for drugs purchased during the contract period.

**ESI's Misappropriation of Manufacturer Rebates
that Should Have Been Paid to The Empire Plan**

80.     ESI is a party to contracts with drug manufacturers pursuant to which the manufacturers pay ESI rebates based on the utilization of that manufacturer's drugs by plan members.

81.     The Empire Plan participates in ESI's Market Share rebate program, under which manufacturers agree to pay ESI a rebate if plans in the Market Share rebate program, in the aggregate, meet or exceed certain benchmarks.  Typically, the manufacturer pays a rebate to ESI if, in the aggregate, plans participating in the program purchase a greater "market share" of that manufacturer's drugs than that drug's national market share.

82.     In the years 1998 through 2003, DCS paid ESI $600,000 annually to administer the rebate program for the Empire Plan.  This payment was in addition to the per claim fee that DCS paid ESI for processing the prescription drug claims of Empire Plan members.

83.     Pursuant to the 1998 and 1999 Contracts and Subcontracts, ESI was required to pass on to DCS one hundred percent (100%) of all rebates received from drug manufacturers resulting from Empire Plan members' use of the manufacturers' drugs.

84.     The 1998 Policy issued to DCS pursuant to the 1998 Contract, which was incorporated into the 1998 Contract and 1998 Subcontract, provided that CLIC would "pass on to the [State] 100 percent of the rebates received from the manufacturers through 12/15/99." In

18

addition, pursuant to the 1998 Policy, DCS was guaranteed a minimum payment of $1.20 per claim, if such amount was greater than 100% of rebates.

85.     In the 1999 Contract, the guaranteed minimum rebate savings were increased to $1.25 per claim.  Although a group insurance policy was not issued in 1999, the 100% rebate pass-on requirement continued, and the parties understood and intended, as under prior policies and contracts, that 100% of the manufacturer rebates would be passed on to the State.

86.     For example, in quarterly transmission letters from ESI to DCS throughout the term of the 1999 Contract, ESI consistently represented to DCS that it was wire-transferring funds to DCS that reflected 100% of the manufacturers' reimbursement savings, or rebates.

87.     In breach of the defendants' obligations under the 1998 Contract, Subcontract and Policy, and the 1999 Contract and Subcontract, to pass on to DCS 100% of all manufacturer rebates from 1998 through 2003, and contrary to ESI's representations that it was doing so, ESI retained for itself millions of dollars in manufacturer rebates attributable to the Empire Plan that should have been paid to the Plan.

88.     In fact, ESI developed a scheme to hide a substantial portion of the rebates it was receiving from manufacturers.  In contracts with manufacturers, the terms of which were kept secret from DCS, ESI disguised portions of the manufacturer rebates as "administrative fees," "data fees," "data management fees," "rebate administration fees," "formulary compliance fees," "performance fees," "professional services fees," and other names.

89.     In an internal ValueRx document, "management fees" were deemed to be "the portion of the rebate that ValueRx keeps for itself.  They can be called Admin. Fees, Data Fees, or Market Fees, but they are all the same . . . ."

19

90.     Many of these fees were duplicative of fees already paid by DCS or manufacturers, and were simply a method for ESI deceptively to divert manufacturer rebates from the Empire Plan and keep those rebates for itself.

91.     For example, in contracts with certain manufacturers, ESI caused 25% of the rebate to be characterized as an "administrative fee" and kept that amount for itself, despite the fact that DCS was already paying ESI a $600,000 annual fee to administer the rebate program.

92.     ESI's deception persisted throughout the terms of the 1998 and 1999 Contracts and Subcontracts.  ESI routinely hid from DCS information related to manufacturer rebates, including information related to administrative, data and other fees.  Despite repeated requests from the State, ESI refused to produce, for auditing purposes, rebate agreements with manufacturers.

93.     The Empire Plan's utilization of drugs for which ESI had rebate agreements with manufacturers resulted in significant rebates being paid to ESI by the manufacturers, thereby conferring a benefit on ESI.  By concealing and retaining a portion of the rebates as administrative and other fees, ESI unjustly enriched itself at the expense of DCS and the State.

**ESI's Unauthorized and Improper Sale of Empire Plan Data**

94.     The 1999 Contract provided that "[a]ll forms, materials, data and publications developed by [CGL] specifically in connection with the [1999 Contract] shall be the property of the DCS."  The 1999 Contract also stated that: "[t]he use of any material and information obtained by [CGL] in the performance of its duties under the [1999 Contract] shall be limited to purposes directly connected with such duties."  In addition, the 1999 Contract provided that:

20

> [a]ll [Empire Plan] prescription drug claims, data regarding State
> employees' workers' compensation accidents and employee and
> enrollment records relating to the [1999 Contract] are confidential
> and shall be used by [CGL] solely for the purpose of carrying out
> its obligations under the [1999 Contract] and for measuring the
> performance of [CGL] in accordance with the performance
> guarantees of the [1999 Contract].

95.    The 1999 Contract then states that (subject to certain limited exceptions not

relevant here) "no such records may be otherwise used or released to any third party by [CGL],

employees, agents, or subcontractors [such as ESI] either during the term of the [1999 Contract]

or in perpetuity thereafter." Finally, "[CGL] shall promptly advise the DCS of all requests made

to [CGL] for information described in this Article XVII including, but not limited to, requests for

any material and information provided by the DCS."

96.    ESI entered into contracts with drug manufacturers, data collection services and

others under which ESI received fees for providing data and services with respect to data

associated with ESI's provision of PBM services to plans. The data and services ESI provided

were used by manufacturers and others for marketing and other purposes.

97.    In breach of contract, ESI sold, licensed or released such Empire Plan data to third

parties without DCS's authorization. Such use of Empire Plan data was not necessary for ESI to

carry out its obligations under the 1999 Contract.

98.    ESI did not disclose to DCS that ESI was selling, licensing, otherwise using or

releasing information and data belonging to DCS or derived from the Empire Plan. Moreover,

DCS was not aware of and did not consent to ESI's sale, license, other use or release of data

belonging to DCS or derived from ESI's services to the Empire Plan.

21

99.     ESI's receipt of fees and compensation in exchange for providing Empire Plan data and other services with respect to Empire Plan data associated with ESI's provision of PBM services to the Empire Plan conferred a benefit on ESI. By concealing and accepting such fees and compensation, ESI unjustly enriched itself at the expense of DCS and the State.

**ESI's Schemes to Increase Generic Drug Prices for the Empire Plan in Order to Enrich Itself**

  **a.     Inflating Pass-Through Generic Drug Prices**

100.    ESI negotiates drug prices with pharmacies that dispense drugs to plan members. ESI administers two types of drug pricing arrangements for plans: (a) "pass-through" pricing, pursuant to which a plan is charged the same amount for drugs that ESI pays the pharmacy, and (b) "spread" pricing. Generally, under the "spread" pricing arrangement, ESI and the plan agree to a guaranteed minimum discount price rate (e.g., AWP -50%) for generic drugs as a class. If ESI can negotiate a lower price with the pharmacy in a spread pricing arrangement, ESI retains as profit (or "spread") the difference between what ESI pays the pharmacy and the amount it charges the plan.

101.    In the 1998 Proposal, CGL and ESI proposed a pass-through pricing arrangement with pharmacies for prescriptions filled in New York State and a spread pricing arrangement for prescriptions filled outside of New York State.

102.    CGL and ESI promised DCS that, if they were awarded the contract, ESI would use the size of the Empire Plan to negotiate the best possible price for generic drugs with pharmacies and pass through that price to the Empire Plan.

22

103.    The 1999 Contract provided for pass-through pricing for all prescriptions filled in New York, as follows:

> The amount charged to the DCS for drugs dispensed by [the Empire Plan's] Network Participating Pharmacies in the State of New York shall be the same amount the Participating Pharmacy is paid by [CGL], plus [CGL's] administrative per claim fee as set forth by the contract between [CGL] and the Participating Pharmacy.

104.    Under the pass-through pricing reimbursement system, DCS relied on ESI's good faith, expertise and ability to negotiate and set prices on the Empire Plan's behalf. Negotiating pricing arrangements with pharmacies was solely the responsibility of ESI. Therefore, DCS requested and obtained specific promises from ESI regarding the process to be employed in negotiating and setting prices with pharmacies that would be passed through to the Empire Plan.

105.    ESI and CGL represented in the 1998 Proposal that they considered their current relationship with DCS to be a "partnership" based on "trust." CGL, in the 1999 Contract, and ESI, through the 1999 Subcontract, promised that they would, on the Empire Plan's behalf, "negotiat[e] pricing arrangements [with pharmacies] that use the [Empire Plan's] size to optimize [drug] cost discounts."

106.    Specifically, with respect to generic drug prices, ESI and CGL promised in the 1998 Proposal that ESI would obtain drugs "at the best time and at the best price" based on "market variables" and "real pharmacy acquisition costs."

107.    Instead, in breach of the 1999 Contract and the 1999 Subcontract, ESI developed and employed a scheme, using and manipulating multiple generic pricing lists, to pay certain retail pharmacy chains higher reimbursement rates for generic drugs for pass-through plans (such

23

as the Empire Plan's in-state network) than for spread plans. ESI could simply pass through the higher cost to pass-through plans, while inducing pharmacies to accept lower reimbursement rates for ESI's spread plans.

108.    In furtherance of this scheme, ESI implemented a policy to pay certain chain pharmacies an overall target generic drug discount rate of AWP -55% for plans that had contracted for pass-through pricing (such as the Empire Plan's in-state network), while paying these same pharmacies an overall discount of AWP -65% for plans that had contracted for spread pricing. Thus, ESI used its ability to set prices for plans that had contracted for pass-through pricing (such as the Empire Plan's in-state network) to improperly and deceptively inflate the price that such plans paid for generic drugs by approximately 10%. Through this scheme, ESI could maximize the spread that it retained for itself in its spread network.

109.    In breach of contract, ESI's higher payments to certain retail chain pharmacies for pass-through plans (such as the Empire Plan's in-state network) were not the best price ESI could negotiate, were not based on market variables or real pharmacy acquisition costs, were not negotiated in the best interests of the Empire Plan, and did not use the Empire Plan's size to optimize discounts.

110.    Furthermore, ESI's active pursuit of its own interests instead of the Empire Plan's violated its fiduciary duty to negotiate and set prices on the Empire Plan's behalf and in the Plan's best interest.

111.    The intended result of ESI's scheme was to generate a bigger spread between the price it was paying pharmacies and the price it was charging plans contracting for spread pricing,

24

so that it could secretly retain such engorged spread for itself, thereby enriching itself to the detriment of plans, including the Empire Plan, that contracted for pass-through pricing.

112.    As a result of ESI's fraudulent scheme and breach of contract, the Empire Plan paid millions of dollars in "pass-through" drug costs that it should not have paid.

**b.    Fraud and Deception in ESI's Generic Enforcement Program**

113.    Pursuant to the 1999 Contract, ESI agreed to operate a mandatory generic substitution program aimed at substituting equivalent lower cost generic drugs for higher cost brand name drugs wherever possible.

114.    Generally, the mandatory generic substitution program provided that, if a physician wrote a prescription for a plan member for a brand name drug that had a generic equivalent, the Empire Plan's cost would be limited to the cost of the generic. If the member insisted that the pharmacist dispense the brand drug, the member would pay the higher brand drug co-pay amount, plus an "ancillary fee" equal to the difference between the cost of the brand drug and the cost of the generic drug, or the member could appeal to the Empire Plan to avoid paying the ancillary fee. Thus, the program provided a significant financial incentive to plan members to accept the substitution of an appropriate generic drug for the brand name drug.

115.    The 1999 Contract defined "generic drug" as follows:

> [a]ny prescription drug that is called by its official, established, nonproprietary name, not by a brand name or trade name chosen by the manufacturer. Such drugs include AB-rated generics and non-AB-rated generics approved by the U.S. Food and Drug Administration as having the same active ingredient as; being therapeutically equivalent to; and in the case of AB-rated generics, being bioequivalent to their brand-name counterparts.

25

116.    In the 1998 Proposal, ESI stated that generic drugs would be eligible for the mandatory generic substitution program if:

> [t]hey are "A" rated by the FDA [ESI later adopted AB rating], or if the drug was approved before 1938 when the requirement for clinical trials that demonstrate efficacy was implemented. Our staff then reviews studies that have been conducted regarding the drug and determines whether or not the drug can be safely substituted. If the drug meets bioequivalency, safety, and efficacy criteria, and if it is available for sale in retail stores, it is added to the [mandatory generic enforcement program].

117.    ESI represented that for each drug that met these criteria, it would establish a price known as the Maximum Allowable Cost ("MAC"), or MAC price. The MAC price was the maximum amount DCS would be charged whether a brand or any equivalent generic of that brand was dispensed. Setting MAC prices was within the complete control of ESI, and DCS placed its trust in ESI and relied on ESI's expertise and good faith in setting MAC prices.

118.    If a drug did not receive a MAC price, the Empire Plan paid a much higher rate.

119.    ESI manipulated the MAC pricing in several ways that denied DCS the benefit of generic substitution and resulted in increased costs for the Empire Plan and its members, while significantly increasing profits for ESI.

120.    First, ESI repeatedly and persistently failed to set MAC prices for drugs that met the established objective criteria in the 1999 Contract.

121.    Second, ESI dramatically increased its profits in the Empire Plan's out-of-state spread pricing network by paying pharmacies the lower MAC price while charging the Empire Plan a higher non-MAC rate.

122.    Third, with respect to some drugs for which it had set a MAC price, ESI caused brand name drugs to be dispensed at brand cost to the Empire Plan.

123.    Fourth, ESI established inflated MAC prices for certain generic drugs by improperly using less favorable discount rates generally applicable to brand drugs.

124.    By manipulating generic pricing as described above, ESI breached its contractual obligations with respect to generic drug substitution and to set MAC prices at the "best price" based on "market variables" and "real pharmacy acquisition costs."  ESI also unjustly enriched itself at the expense of DCS.

125.    Furthermore, ESI's active pursuit of its own interests instead of the Empire Plan's violated its fiduciary duty to negotiate and set prices on the Empire Plan's behalf and in the Plan's best interest.

**ESI's Fraud and Deception in the**
**Operation of Its Drug Preference Programs**

126.    ESI and ESI Mail (collectively referred to as "ESI" in paragraphs 126-141) operate, and offer to plans, including the Empire Plan and other non-ERISA plans providing prescription drug benefits for State and local government employees in New York, "drug preference" programs, including "switching" programs, intended to switch members from a currently prescribed drug to another drug.  ESI's drug preference programs include those with names such as OptiMed, Drug Choice Management, Preferred Drug Transition, Physician Direct, Drug Choice Education, Patient Education, and Formulary Management (collectively "Drug Preference Programs").

127.    ESI's Drug Preference Programs are carried out by ESI pharmacists and other

personnel.  ESI provides training, instruction, phone scripts and other form communications to its

pharmacists and other personnel concerning how to conduct Drug Preference Programs.

128.    ESI represents to plans that its Drug Preference Programs will save plans and

members money by generating rebates for the plan from drug manufacturers as a result of the

plan's increased usage of a particular drug, known as the "preferred" drug, and that the programs

will promote quality of care and better drugs.

129.    ESI represents that, unlike other PBMs, it is an entity independent of drug

manufacturers, and its decisions regarding switching members from one drug to a preferred drug

are free from the manufacturer's influence.  In fact, ESI receives large payments from drug

manufacturers to conduct Drug Preference Programs favoring a particular manufacturer's drugs.

Indeed, use of a preferred drug always results in manufacturer payments to ESI in the form of

rebates and/or separate payments, which ESI does not always pass along to a plan.

130.    ESI uses prepared phone scripts, form letters and other form communications to

physicians to encourage them to prescribe a preferred drug.  Among the representations ESI

makes to physicians in order to encourage prescribing a preferred drug are that the switch will

promote quality of care, better drugs and lower cost.

131.    ESI deploys programs in the Empire Plan that promote the use of "preferred"

drugs through distribution of preferred drug lists and other materials to physicians and

pharmacists who serve Empire Plan members.

132.    ESI deploys programs in certain other non-ERISA plans providing prescription

drug benefits for State and local government employees in New York that involve actively

28

switching patients to a "preferred" drug ("Switching Programs"). In these programs, when ESI receives a prescription at one of its mail order pharmacies or when a patient submits a prescription at a retail pharmacy for a targeted drug for which there is a "preferred" drug, ESI attempts to persuade the physician to switch the patient's prescription.

133.    In Switching Programs, if the requested switch is authorized by the physician, ESI generates and sends a letter to the patient stating that his or her physician authorized the preferred drug and the patient's former prescription has been changed. The patient is typically not contacted prior to this communication. ESI's letters to patients represent that the drug switch will provide the patient with a better medication, and/or will save money for the plan and/or member.

134.    Contrary to ESI's representations to plans, physicians and patients, its Drug Preference Programs do not always save plans and/or members money. Indeed, in many instances the only entity benefitting from the use of preferred drugs is ESI, which is being paid by the manufacturers to promote their drugs.

135.    For example, in its Switching Programs, ESI has actively switched patients from lower priced drugs to higher priced drugs. These switches directly harm the plan, which must pay for the higher cost drug, and the member, if, for example, the co-pay amount is a percentage of the cost of the drug.

136.    Additionally, ESI received funding from brand drug manufacturers to steer plan members away from less expensive generic drugs. For example, when a brand name drug was about to be subject to generic competition, ESI, in the period prior to the introduction of the generic drug, would steer members from that brand drug to a different brand drug made by the

29

same manufacturer that did not face imminent generic competition. These initiatives increased prescription drug spending by plans and members, while enriching ESI.

137.    In its Drug Preference Programs, ESI effectuates switches and encourages the use of preferred drugs that increase costs even when the preferred drug is a nominally lower priced preferred drug. For many drug therapies a switch from one drug to another requires more than simply changing a prescription and taking the new pill. It often requires one or more tests and may require one or more doctor visits to monitor the new drug therapy and ensure the new drug's efficacy. These additional health care costs often would not have been incurred but for ESI's drug switches.

138.    Plans and members, not ESI, pay for the costs associated with ESI's Drug Preference Programs. Costs to the member include applicable co-payments for testing and doctor visits for dosage adjustment and monitoring, or the full payment if a deductible has not been met. The plan pays the balance of the costs of testing and doctor visits. With respect to certain of ESI's drug switches, the switch-related costs borne by the plans and members greatly exceed any cost savings attributable to a lower price for the preferred drug.

139.    ESI is aware of the costs common to certain drug switches, but unlike other PBMs, ESI does not reimburse patients or plans for switch-related costs.

140.    ESI's representations to plans, members and physicians that its Drug Preference Programs will promote quality of care and better drugs also are misleading. Altering a patient's drug therapy can lead to side effects, which at times can be serious. In addition, sometimes the preferred drug will not be as effective as the previously prescribed drug.

141.    ESI fails to disclose the negative effects, fails to involve the patient in the decision to switch drugs, and takes no steps to follow-up with patients once the drugs have been switched. In fact, ESI does not monitor the outcome of its drug switches in any fashion.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### BREACH OF CONTRACT (as against CGL).

142.    By the acts, practices and omissions described above, CGL breached the 1998 Contract and 1999 Contract, to which DCS was a party.

143.    As a result of these contract breaches, DCS and the State were injured.

### SECOND CAUSE OF ACTION:
### BREACH OF CONTRACT (as against ESI).

144.    By the acts, practices and omissions described above, ESI breached the 1998 Subcontract and 1999 Subcontract, to which DCS was an intended third-party beneficiary.

145.    As a result of these contract breaches, DCS and the State were injured.

### THIRD CAUSE OF ACTION:
### BREACH OF CONTRACT (as against CLIC).

146.    By the acts, practices and omissions described above, CLIC breached the 1998 Policy that CLIC issued.

147.    As a result of these breaches, DCS and the State were injured.

## FOURTH CAUSE OF ACTION:
### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
#### (as against CGL, ESI and CLIC).

148.    By the acts, practices and omissions described above, CGL under the 1998

Contract and the 1999 Contract, ESI under the 1998 Subcontract and 1999 Subcontract, and

CLIC under the 1998 Policy, failed to act in good faith and did not deal fairly with DCS.

149.    As a result of ESI's, CGL's and CLIC's breach of their duty of good faith and fair

dealing, DCS and the State were injured.

## FIFTH CAUSE OF ACTION:
### UNJUST ENRICHMENT (as against CGL, ESI and CLIC).

150.    By the acts, practices and omissions described above, ESI, CGL and CLIC

unjustly enriched themselves against equity and good conscience.

151.    As a result of ESI's, CGL's and CLIC's acts, practices and omissions, DCS and

the State were injured.

152.    It would be inequitable, unjust and contrary to good conscience to permit CGL,

ESI and CLIC to retain the rebates, spread, payments and other funds they obtained as a result of

their acts, practices and omissions.

## SIXTH CAUSE OF ACTION:
### BREACH OF FIDUCIARY DUTY (as against ESI and CGL).

153.    By the acts, practices and omissions described above, CGL and ESI breached their

fiduciary duty to DCS and the State.

154.    As a result of CGL's and ESI's breach of their fiduciary duty, DCS and the State

were injured.

32

## SEVENTH CAUSE OF ACTION:
## CGL's DUTY TO INDEMNIFY DCS AND THE STATE
### (as against CGL).

155.   By the acts, practices and omissions described above, ESI, ESI Mail, CGL and CLIC caused injury and loss to DCS and the State.

156.   Pursuant to the terms of the 1998 Contract and 1999 Contract, CGL must indemnify DCS and the State for all such injury and loss.

157.   CGL has not indemnified DCS or the State.

## EIGHTH CAUSE OF ACTION:
## CLIC's DUTY TO INDEMNIFY DCS AND THE STATE
### (as against CLIC).

158.   By the acts, practices and omissions described above, ESI, ESI Mail, CGL and CLIC caused injury and loss to DCS and the State.

159.    Pursuant to the terms of the 1998 Policy, CLIC must indemnify DCS and the State for all such injury and loss.

160.   CLIC has not indemnified DCS or the State.

## NINTH CAUSE OF ACTION:
## FRAUD IN THE INDUCEMENT (as against ESI).

161.   By the acts, practices and omissions described above, ESI knowingly misrepresented effective pharmacy price discounts in the 1998 Proposal, thereby fraudulently inducing DCS into entering the 1999 Contract.

162.   DCS relied upon these misrepresentations and, as a result, DCS and the State were injured.

33

**TENTH CAUSE OF ACTION:**
**NEGLIGENT MISREPRESENTATION (as against ESI and CGL).**

163.    By the acts, practices and omissions described above, ESI and CGL misrepresented effective pharmacy price discounts in the 1998 Proposal negligently, recklessly and carelessly, and without a reasonable basis to know whether the misrepresentations were true or false, thereby inducing DCS to enter into the 1999 Contract.

164.    DCS relied upon these misrepresentations and, as a result, DCS and the State were injured.

**ELEVENTH CAUSE OF ACTION:**
**VIOLATIONS OF EXECUTIVE LAW § 63(12)**
**(as against ESI and ESI Mail).**

165.    Executive Law § 63(12) authorizes the Attorney General to commence an action for any repeated or persistent fraudulent or illegal business activity.

166.    By the acts, practices and omissions described above, ESI and ESI Mail engaged in repeated or persistent fraudulent or illegal business activity.

167.    By these acts and practices, ESI and ESI mail violated Executive Law § 63(12).

**TWELFTH CAUSE OF ACTION:**
**DECEPTIVE BUSINESS PRACTICES IN VIOLATION**
**OF GENERAL BUSINESS LAW § 349 (as against ESI and ESI Mail).**

168.    GBL § 349(a) states that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

169.    By the acts, practices and omissions described above, ESI and ESI Mail engaged in deceptive business activity.

34

170.    By these acts and practices, ESI and ESI Mail violated GBL § 349.

171.    By repeatedly and persistently violating GBL § 349, ESI and ESI Mail have

engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

### THIRTEENTH CAUSE OF ACTION:
### VIOLATIONS OF NEW YORK EDUCATION LAW
### and IMPLEMENTING REGULATIONS
### (as against ESI and ESI Mail).

172.    Pursuant to New York Education Law § 6509 and 8 NYCRR § 29.1, it is

professional misconduct for ESI and ESI Mail to exercise undue influence on a patient or plan,

including the promotion of the sale of services, goods, appliances or drugs in such manner as to

exploit a patient or plan for the financial gain of the practitioner or of a third party.

173.    Pursuant to Education Law § 6808, ESI and ESI Mail, as owners and/or operators

of a pharmacy, are responsible for the proper conduct of the pharmacy.

174.    Pursuant to Education Law §§ 6810 and 6816-a, ESI and ESI Mail must fill

prescriptions with generic equivalents when available.

175.    By the acts, practices and omissions described above, ESI and ESI Mail,

individually and through their pharmacists, violated Education Law §§ 6509, 6808, 6810, and

6816-a, and 8 NYCRR § 29.1.

176.    By repeatedly and persistently violating Education Law §§ 6509, 6808, 6810, and

6816-a, and 8 NYCRR § 29.1, ESI and ESI Mail, individually and through their pharmacists,

have engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

35

**REQUESTED RELIEF**

WHEREFORE, Plaintiffs request a judgment:

1.　　Permanently enjoining defendants ESI and ESI Mail from the illegal, deceptive and fraudulent activities complained of herein insofar as those activities relate to the Empire Plan, other non-ERISA health and prescription drug benefit plans of the State and its political subdivisions, and the members of such plans;

2.　　Directing defendants ESI, CGL, and CLIC to pay DCS and the State of New York damages for breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, and unjust enrichment;

3.　　Directing defendants ESI and CGL to pay DCS and the State of New York damages for negligent misrepresentation;

4.　　Directing defendant ESI to pay DCS and the State of New York damages for fraudulently inducing DCS to enter into the 1999 Contract;

5.　　Directing defendants CGL and CLIC to indemnify DCS and the State for their injury and loss, including for attorneys fees and the costs of this litigation;

6.　　Directing defendants to pay restitution and damages to injured members of the Empire Plan and other non-ERISA health and prescription drug benefit plans of the State and its political subdivisions;

7.    Directing defendants ESI and ESI Mail to pay a civil penalty of $500 to the State of New York, pursuant to GBL § 350-d, for each instance of a deceptive act or practice;

8.    Awarding plaintiffs costs; and

9.    Granting such other and further relief as this Court deems just and proper.

Dated: Albany, New York
       August 4, 2004

ELIOT SPITZER
Attorney General of the
State of New York
Attorney for Plaintiffs

Troy J. Oechsner
Assistant Attorney General
of Counsel
Health Care Bureau
The Capitol
Albany, New York   12224
(518) 474-8376

Joseph R. Baker III
Assistant Attorney General-in-Charge
Health Care Bureau

Thomas G. Conway
Assistant Attorney General-in-Charge
Bureau of Consumer Frauds and Protection